Filed 4/14/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B261458 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA116734) |
| v. | |
| ISMAEL CARDONA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Robert J. Higa, Judge. Affirmed in part, reversed in part.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part III of the discussion.

Appellant Ismael Cardona challenges his convictions for murder and attempted murder arising from an incident at a party during which he shot two people, killing one and wounding the other. Cardona contends that the trial court erred by giving the jury a "kill zone" instruction with respect to the attempted murder charge. He also contends that the trial court erred with respect to the murder charge by instructing the jury regarding the limitations to the right of self-defense available to a defendant who was the initial aggressor in the confrontation with the victim. We agree with Cardona's contention regarding the attempted murder charge, but disagree regarding the murder charge. Accordingly, we affirm the judgment in part and reverse in part.

## FACTS AND PROCEEDINGS BELOW

Cardona attended a party in the backyard of a house in Whittier on the night of April 3, 2009. Three friends accompanied him to the party, all members of a street gang known as MFT.

Paul Jauregui also attended the party accompanied by his friends. He brought with him a tank containing nitrous oxide, or "noz," from which he was selling doses to partygoers. Cardona and one of his friends approached Jauregui and his friends. The noz tank fell over. Jauregui and a friend tried to grab it, but Cardona's friend wrestled it away and ran out of the party. Cardona pulled a gun on Jauregui and said, " 'Give me your money,' " and " 'It's our tank now.' " Jauregui pushed the gun away, grabbed Cardona by the shoulder, and stabbed him several times with a switchblade. Cardona pushed Jauregui off of him and shot at Jauregui five or six times. Jauregui fell to the ground, and Cardona fired the last of the shots while standing over Jauregui or fleeing the scene. Jauregui suffered three gunshot wounds to his buttocks or the back of his thigh, and one to the back of his arm or shoulder. He later died of his injuries.

Bryan Carrillo, who was standing nearby, turned to run away when he heard the first of the shots. When he was no more than 15 to 20 feet away from Cardona, one of the later shots struck Carrillo in the back, seriously injuring him.

2

An information charged Cardona with one count of first degree murder and one count of attempted murder, in violation of Penal Code sections 187 and 664, respectively, along with special circumstance, gang, and firearm enhancements.[1] After a trial in July 2014, a jury found Cardona guilty of both counts and found all the enhancements true, with the exception of the firearm enhancement with respect to the attempted murder count. The court sentenced Cardona to life imprisonment without the possibility of parole for the murder, plus 25 years to life for the firearm enhancement, and 15 years to life for the attempted murder, plus 25 years to life for the firearm enhancement.

## DISCUSSION

Cardona raises several issues on appeal. He contends that the trial court erred when it gave a kill zone instruction with respect to the attempted murder charge.[2] Cardona further contends that the prosecution presented insufficient evidence to support his conviction for attempted murder. He also contends that the trial court erred by giving jury instructions regarding self-defense by an aggressor. Finally, he argues that the court erred in imposing a parole revocation fine.[3] We reverse Cardona's attempted murder conviction and parole revocation fine, but otherwise affirm.

---

[1] Unless otherwise specified, all statutory references are to the Penal Code.

[2] Because we reverse Cardona's conviction for attempted murder in count 2, we need not address his additional contentions pertaining to this count, including whether it was proper to impose a sentence of 15 years to life for this count, and whether the trial court erred by imposing a sentence enhancement with respect to this count that the jury did not find true.

[3] Cardona contends that the trial court erred by imposing a $300 parole revocation fine. We agree. Because Cardona was sentenced to life imprisonment with no possibility of parole, it was improper to impose a parole revocation fine. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181-1183.)

3

I.       *Kill Zone Instruction*

Cardona argues that the trial court erred when it instructed the jury pursuant to a kill zone theory of liability for attempted murder.**4**  We agree.

A.       *Forfeiture*

The Attorney General argues that Cardona forfeited this claim because his attorney failed to object to the kill zone instruction in the trial court.  In general, the failure to object to an instruction bars a defendant from challenging the instruction on appeal.  (*People v. Bolin* (1998) 18 Cal.4th 297, 326.)  When an instructional error affects a defendant's substantial rights, however, a court may address it in spite of the failure to preserve the issue in the trial court.  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1294, fn. 28; §§ 1259, 1469.)  "In this regard, '[t]he cases equate "substantial rights" with reversible error' under the test stated in *People v. Watson* (1956) 46 Cal.2d 818." (*People v. Felix* (2008) 160 Cal.App.4th 849, 857.)  Because we find that instructional error in this case was reversible error under the *People v. Watson* test (see section I.C, *post*, at p. 8), we conclude that Cardona did not forfeit the argument.  (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.)

B.       *Instructional Error*

" 'The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from

---

**4** The court instructed the jury as follows, pursuant to the then-current version of CALJIC No. 8.66.1:  "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk.  This zone of risk is termed the 'kill zone.'  The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity.

"Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone' is an issue to be decided by you."  When the court read this instruction to the jury, its wording varied slightly, but not materially.

4

making findings on relevant issues." [Citation.] "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation]." [Citation.]' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921.) Accordingly, if the record contains no evidence that would support application of the kill zone theory, then the trial court erred by instructing the jury on that theory.

There is a crucial distinction between the mental states required for a defendant to be convicted of murder and attempted murder: "Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices." (*People v. Bland* (2002) 28 Cal.4th 313, 327 (*Bland*).) In contrast, " '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*), quoting *People v. Lee* (2003) 31 Cal.4th 613, 623.)

This distinction has created complications in cases where a defendant attacks multiple victims. Under the doctrine of transferred intent, when a defendant fires a gun in an attempt to kill one victim, but the bullet strikes and kills a bystander, the defendant is guilty of murder even if he did not know the bystander was present. (*Bland*, *supra*, 28 Cal.4th at pp. 320-321.) But the doctrine of transferred intent does not apply when an unintended victim survives the attack. (*Id.* at pp. 326-331.) The court in *Bland* reasoned that applying the doctrine of transferred intent would make liability for attempted murder too vague: "The world contains many people a murderous assailant does not intend to kill. Obviously, intent to kill one person cannot transfer to the entire world. But how can a jury rationally decide which of many persons the defendant did not intend to kill were attempted murder victims on a transferred intent theory?" (*Id.* at p. 329.)

The Supreme Court in *Bland*, *supra*, 28 Cal.4th 313, introduced the kill zone theory to address another variation of this theme—situations in which a defendant attempts to kill an entire group of people in order to kill a specific victim. Because the

5

defendant acts with the specific intent to kill everyone in the victim's vicinity, he is guilty of attempted murder of each member of the group. (*Id.* at pp. 329-330.) The theory of guilt here is not transferred intent, but rather concurrent intent, meaning that " 'the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Id.* at p. 329.)

The *Bland* court provided examples of situations in which a kill zone theory is appropriate. The paradigmatic example is that of " 'an assailant who places a bomb on a commercial airplane intending to harm a primary target on board [who] ensures by this method of attack that all passengers will be killed.' " (*Bland*, *supra*, 28 Cal.4th at pp. 329-330.) The *Bland* court also cited the example of *People v. Vang* (2001) 87 Cal.App.4th 554, 563–565, in which the defendants fired multiple rounds with high-powered, wall-piercing weapons at two occupied houses. Although the defendants primarily meant to kill one victim, they were convicted of 11 counts of attempted murder, one for each inhabitant of the house. (*Id.* at p. 563.) According to the *Bland* court, the court in *Vang* analyzed the case under the same reasoning as the kill zone theory, even if it did not use that name. (*Bland*, *supra*, 28 Cal.4th at p. 330.) In *Bland* itself, the court held that the kill zone theory was appropriate, noting that the defendant was liable for two counts of attempted murder for "fir[ing] a flurry of bullets at [a] fleeing car and thereby creat[ing] a kill zone." (*Id.* at p. 331.)

By contrast, when there is no evidence of an intent to kill an entire group of people, courts have held that the kill zone instruction is inappropriate. Thus, in *People v. Stone* (2009) 46 Cal.4th 131 (*Stone*), the defendant fired a single shot at a group of 10 people, not striking any of them. (*Id.* at pp. 134-135.) Our Supreme Court held that "[t]he kill zone theory simply does not fit the charge or facts of this case" because there was no evidence that the defendant intended to take the lives of the entire group in order to kill one victim. (*Id.* at p. 138.) In another case with similar facts, the Supreme Court held that "[t]he facts of this case do not establish that defendant created a 'kill zone' by firing a single shot from a moving car at a distance of 60 feet at [a] group of eight

6

individuals." (*People v. Perez* (2010) 50 Cal.4th 222, 232 (*Perez*).) And in *People v. McCloud* (2012) 211 Cal.App.4th 788 (*McCloud*), we held that a kill zone theory did not support the defendants' conviction of 46 counts of attempted murder when they fired 10 shots into a crowded party. (*Id.* at pp. 799-800.)

The Attorney General argues that *McCloud*, *Perez*, and *Stone* are distinguishable because, in each case, the defendant did not fire enough shots to kill all of the victims for whom he was convicted of attempted murder. Here, however, Cardona was charged with only one count of murder and one count of attempted murder, and he fired at least five shots, including one that struck and seriously wounded Carrillo. But the defining test of the kill zone theory is whether "the evidence supports a reasonable inference that, as a means of killing the primary target, the defendant specifically intended to kill every single person in the area in which the primary target was located." (*McCloud*, *supra*, 211 Cal.App.4th at p. 803.) A correlation between the number of shots fired and the number of victims in the alleged kill zone is merely one relevant factor. The Attorney General also points out that, unlike the defendants in *McCloud* and *Stone*, Cardona had a primary target, namely Jauregui. In *McCloud*, *supra*, 211 Cal.App.4th at p. 801, we held that a kill zone instruction was inappropriate in part because there was no evidence that the attacker had a primary target. But the existence of a primary target, although relevant, is not sufficient for the application of the kill zone theory. Again, without evidence that the defendant intended to kill everyone in an area in order to kill the primary target, the kill zone theory is inapplicable. (*Id.* at p. 802.)

The facts of this case are a poor fit for the kill zone theory. The evidence showed that Cardona first fired his weapon after Jauregui stabbed him. As we explain below, because Cardona provoked the attack by drawing his gun and attempting to rob Jauregui, the shooting was not justifiable self-defense. Nevertheless, all the available evidence indicated that Cardona's primary motivation in shooting Jauregui was to defend himself. The shooting took place in a crowded party, but no witness testified that Cardona sprayed everyone near Jauregui with gunfire. Without evidence of an attempt by Cardona to kill

everyone in a particular area in order to kill Jauregui, it was error for the trial court to give the kill zone instruction.

C.    *Prejudice*

A state law instructional error does not require reversal of a conviction unless it is reasonably probable that the defendant would have obtained a better result in the absence of the error.  (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214, citing *People v. Watson*, *supra*, 46 Cal.2d at pp. 836–837.)  We conclude that there was a reasonable probability that Cardona would have obtained a better result if not for the kill zone instruction, and we accordingly hold that the conviction for attempted murder must be reversed.

The only theory of attempted murder liability the prosecution presented to the jury was the kill zone theory.  In closing arguments, the prosecution suggested that the kill zone theory allowed for a conviction of attempted murder in the absence of specific intent.  The prosecutor argued:  "When Mr. Cardona is up and he is looking at Mr. Jauregui on the ground, lying on the ground, with his back towards him and he continues to shoot him, what is his purpose?  He is intending to kill Mr. Jauregui at that point in time.  Right.  And when you have that, ladies and gentlemen, and you have this instance where we are at a party with numerous people, . . . and you heard that there [were] people around them, these people who are near that shooting site are in a 'risk zone' this 'kill zone' and so when Mr. Carrillo gets hit, he becomes this transferred intent that the kill zone instruction talks about, . . . this concurrent intent to kill others."  The prosecutor thus effectively invited the jury to conclude that Cardona was guilty of attempted murder of Carrillo because he shot at Jauregui while other people were nearby, even if he did not intend to kill anyone other than Jauregui.  Even assuming the kill zone theory was applicable under our facts, the prosecutor seriously misstated the application of the theory by suggesting that Cardona could be guilty of attempted murder through

8

transferred intent. As explained above, transferred intent does not apply to the kill zone theory, nor is it a valid theory for attempted murder.[5]

Given the erroneous instruction and the prosecutor's misstatement of its application, it is not surprising that the jury struggled with its deliberations on attempted murder. Indeed, the jury submitted the following question to the court: "We need further clarification of the kill zone. Does there have to be intent to kill/murder in order to be found guilty of attempted murder? In other words, if someone is accident[al]ly shot in the kill zone, is this considered attempted murder?" The court's response was not written or transcribed in the record, but it apparently did not clear up the jury's confusion, because later the same day, the jury submitted another question: "Is disregarding/endangering human life and shooting, the same as intending to kill the primary victim *by* shooting everyone in the vicinity[?]" (Capitalization omitted.) This time, the jury withdrew the question before the court responded. These questions show that the jury had doubts about whether the kill zone instruction allowed it to find Cardona guilty of attempted murder even if he shot Carrillo only "accident[al]ly" or while "disregarding [or] endangering human life." Without the improper instruction, it is reasonably probable that the jury would have found Cardona not guilty of attempted murder of Carrillo. For this reason, the error was prejudicial, and reversal of Cardona's attempted murder conviction is required.

---

[5] In addition, the prosecutor may have created further confusion by describing the kill zone as a "risk zone." The term "zone of risk," which also appears in the pattern jury instruction on the kill zone (CALJIC No. 8.66.1), suggests that a defendant may be guilty of attempted murder under a kill zone theory simply for placing others at a risk of being killed. This may encourage juries to convict defendants erroneously upon a finding of implied, rather than express, malice. None of the Supreme Court cases that have addressed the kill zone theory use the term "zone of risk" as a substitute for "kill zone." (See *Bland*, *supra*, 28 Cal.4th 313; *Smith*, *supra*, 37 Cal.4th 733; *Stone*, *supra*, 46 Cal.4th 131; and *Perez*, *supra*, 50 Cal.4th 222.)

II.     *Sufficiency of the Evidence of Attempted Murder*

Cardona argues that the prosecution failed to present sufficient evidence to support his conviction for willful, deliberate, and premeditated attempted murder. Although we have already concluded that his conviction must be reversed, we must address this issue because if the prosecution did not produce substantial evidence of attempted murder, it would be barred from retrying Cardona for this offense.

In reviewing the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028.) Under this standard, we conclude that the prosecution did introduce sufficient evidence to convict Cardona of willful, deliberate, and premeditated attempted murder.

The evidence introduced at trial regarding the circumstances of the shooting was contradictory. Some witnesses testified that Cardona fired two or three shots at Jauregui, then stood over him and fired two or three more shots after Jauregui had fallen face down on the ground. Another witness testified that Cardona fired the last few shots while he was fleeing from the party. Carrillo testified that Cardona was within 20 feet of him, and possibly even closer, at the time of the shooting. From all this testimony, a jury could reasonably conclude that Cardona aimed each of his shots at Jauregui, and that he hit Carrillo only because he missed his primary target. Alternatively, a jury could conclude that Cardona aimed at least one of his shots at Carrillo to thwart anyone from preventing his escape. As the Attorney General correctly points out, " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." ' " (*Smith*, *supra*, 37 Cal.4th at p. 741.) Furthermore, attempted murder requires that the defendant act with the specific intent to kill, but it does not require that the defendant have a specific victim in mind. (*Stone*, *supra*, 46 Cal.4th 131, 140-141.) Finally, " '[t]he process of premeditation and deliberation does not require any extended period of time.' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) Thus, the

10

prosecution introduced sufficient evidence that could support a conviction for willful, deliberate, and premeditated attempted murder.

III.    *Self-Defense Instructions*

Cardona contends that the trial court erred by instructing the jury on self-defense by an aggressor and contrived self-defense. He argues that there was insufficient evidence to support these instructions. We disagree.

A killing is justified and not punishable if it was committed in perfect self-defense. (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305; § 197.) "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] . . . To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) A person who has been attacked may stand his ground and need not attempt to retreat. (*People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1346-1347.) When the killer acted as an initial aggressor or contrived the need for self-defense, however, he may not claim self-defense as a justification unless he can show that he tried in good faith to refuse to continue fighting, and caused his opponent to be aware both that he wanted to stop fighting and that he actually had stopped fighting. (*People v. Button* (1895) 106 Cal. 628, 632.)

Cardona argues that he was not the initial aggressor because it was his friend who initiated the confrontation with Jauregui by stealing the noz tank, and that Cardona drew his gun only after Jauregui stabbed him. But at least one witness testified that Cardona first approached Jauregui with his gun drawn, and only then did Cardona's friend move in and take the noz tank. Furthermore, several witnesses said they saw Cardona get into fights and commit at least one robbery prior to the shooting. This was sufficient evidence to put into question whether Cardona had initiated the attack on Jauregui and created the need to use self-defense. Accordingly, the jury instruction on this issue was proper. (See *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 [self-defense instruction required where there was sufficient evidence for a jury to find defendant had requisite mental state].)

11

**DISPOSITION**

The judgment of the trial court is reversed with respect to count 2, attempted murder. The parole revocation fine is reversed. In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


LUI, J.