BLEASE, Acting P. J.
*811 *27 This case involves a jury finding of attempted homicide pursuant to a "kill zone" theory. It arises from a shooting in a crowded bar. On a Saturday night of a long July 4th holiday weekend, defendant Shane Michael Warner took a semiautomatic hand gun, concealed in his waistband into a bar. He shot across the bar's semi-dark dance floor, illuminated by a strobe light, at I. Smith, who had attacked him a few weeks earlier. Defendant emptied the gun's clip of 10 bullets and wounded, but did not kill his primary target, Smith, and wounded, but did not kill an innocent bystander, N.C. Defendant claimed to have acted in self-defense, but there was no evidence that Smith was armed.
The prosecution charged defendant with two counts of attempted murder and one count of assault with a semiautomatic firearm. The jury was unable to reach a verdict on the attempted murder of Smith, and the prosecution eventually dismissed that count. The jury acquitted defendant of the attempted murder of N.C., but found him guilty of the lesser included offense *28 of attempted voluntary manslaughter. The jury convicted defendant of assaulting N.C. with a semiautomatic firearm. The trial court sentenced defendant to 22 years in prison, calculated as follows: nine years (upper term) for the assault, plus 10 years for personal use of a firearm pursuant to Penal Code section 12022.5, subdivision (a), plus three consecutive years for the personal infliction of great bodily injury. The trial court stayed the attempted voluntary manslaughter sentence of five years six months pursuant to Penal Code section 654.
In the published portion of this opinion defendant argues there is insufficient evidence to sustain his conviction for attempted voluntary manslaughter because he did not intend to kill N.C. He argues it was error to allow the prosecution to infer intent from a "kill zone" theory, and to so instruct the jury. The instruction said: "a person may intend to kill a specific victim or victims and, at the same time, intend to kill everyone in a particular zone of harm or ... 'kill zone.' " The intent is concurrent. It occurs "when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." ( People v. Bland (2002) 28 Cal.4th 313, 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107 ( Bland ).) The intent is imputed to the defendant from the extreme danger to life tendered by such conduct.
We conclude that the trial court did not err in allowing the prosecutor to argue defendant intended to kill N.C. under a "kill zone" theory, and in so instructing the jury. " 'Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " ( Bland, supra , 28 Cal.4th at pp. 329-330, 121 Cal.Rptr.2d 546, 48 P.3d 1107, quoting Ford v. State (Md.Ct.App. 1993) 330 Md. 682, 717, 625 A.2d 984.) Defendant's actions in shooting a gun multiple times at a group of people on a crowded, semi-dark dance floor provided facts from which a reasonable jury could infer he intended to kill people on the dance floor, including N.C.
*812 We issued a published opinion on May 7, 2019, affirming the judgment. On May 22, 2019, defendant filed a petition for rehearing asking us to address his supplemental brief seeking a remand to the trial court for retroactive application of Senate Bill No. 620 (2017-2018 Reg. Sess.) (hereafter Senate Bill 620), which would allow the trial court to exercise its discretion to dismiss the firearm enhancement. We will remand the matter to the trial court for the sole purpose of determining whether to exercise its discretion to dismiss the section 12022.5, subdivision (a) firearm enhancement.
FACTUAL AND PROCEDURAL BACKGROUND
The shooting occurred at LaSalle's Bar in Chico, California. About three weeks prior to the shooting, defendant and Smith got into an argument after defendant confronted Smith about wearing a blue Los Angeles Dodgers cap. Defendant and Smith were told to leave the bar. After defendant and Smith left the bar, Smith punched defendant several times in the face. Defendant testified that before he lost consciousness, he heard Smith say, "If you come around my turf again, I'm going to kill you." Defendant sustained a concussion, a contusion on his right and left eye, a chipped tooth, scratches all over his face, a busted lip, and a sore rib. Defendant testified that his friends later told him to stay away from Smith because Smith was dangerous and had gang ties.
*29 Defendant testified that before the fight, he had purchased an unregistered nine-millimeter Glock handgun off the streets. He said he purchased it to protect his household, but did not normally carry it on his person. Nevertheless, he had it in his back waistband when he went to LaSalle's Bar on July 2, 2011, the night of the shooting. He arrived at the bar wearing a red Cincinnati Reds cap, even though he was a San Francisco Giants fan. The Cincinnati cap matched his outfit, which was all red and black.
Andre Shaw was at LaSalle's Bar the night of the shooting with his friend N.C. Defendant, whom they did not know, asked Shaw at one point if he was from Chico. N.C. and Shaw went to the bar's back patio, and Shaw was dancing on the dance floor. N.C. was standing next to him. Shaw heard two shots, then looked around to see defendant standing next to the DJ booth with a gun in his hand, firing it in the middle of the bar. Defendant was firing in Shaw's direction, and Shaw thought that defendant was aiming for him. Shaw ran out of the bar and did not see anyone get injured.
N.C. was standing near Shaw when she felt something hit her back. She fell to the floor. She saw Smith also on the ground, but not close enough for her to touch. She saw defendant standing at Smith's feet, shooting at Smith's chest area as Smith lay on the ground. N.C. was having difficulty breathing because her lung had been punctured. She also had a bruise on her right front hip where she carried her ATM card and ID. She later discovered a bullet lodged in her ID. A bullet went in her arm, and she continues to have muscle spasms in her arm and back.
Another bar patron heard the first two shots, then moments later saw a man (Smith) drop to the ground. The shooter ran up, stood over the victim, and continued shooting him. The shooter emptied his clip into Smith as Smith lay on the ground, stepped away, did a little yell as if he'd scored a touchdown, and ran out the side door. Another patron said she heard the shots first, turned, and saw defendant *813 walking across the bar shooting the gun.[1]
One of the bartenders saw defendant shooting, and saw him slowly walking and moving to the right, swooping with his arm. Defendant had a snarl on his face. Defendant shot with one hand, and did not stabilize the gun with the other hand. There were about 280 patrons in the bar that night, plus staff. The bouncers count the patrons with a clicker as they come in. The bartender estimated there were about 50 people in the back patio area where the shooting occurred.
Defendant ran out of the bar and was chased and caught by one of the bouncers, who had looked up to see defendant after hearing the first shot. He *30 watched defendant walk up to Smith and shoot again two or three more times. When the bouncer caught defendant after the shooting, defendant told the bouncer he had not done the shooting. The bouncer told defendant he had seen defendant do it, to which defendant did not reply. Defendant's gun was found discarded in some bushes. Defendant also told police initially that he had not done anything, and had not been at LaSalle's Bar that night.
When defendant was booked into the Butte County jail the next day, he stated that he was a "Blood associate but not a gang member," and that he could not be housed with Crips because the victim was "basically a Crip." Defendant thought Smith was a Crip because he wore the color blue.
The parties stipulated that a gun recovered from the bushes was a Glock firearm. The slide of the gun was locked open and there was no ammunition inside the magazine or barrel. Ten spent casings were collected from the scene of the shooting. All were fired from defendant's gun. The first spent casing was found all the way across the bar. Five more casings were found about halfway to the victim, and four more casings were found beside the victim. The floor of the bar, which was asphalt, had three impact marks from bullets beside where Smith had fallen. Based on the damage to the bullet fragments, these marks appeared to have been made when defendant was shooting in a downward direction. Three bullet impact marks were found in the wooden fence behind Smith, and one bullet was recovered that passed through the fence and lodged in a post. The two bullets recovered from N.C., and a bullet recovered from Smith's back were also fired by defendant's gun. At least some of the bullet fragments recovered were hollow point bullets, designed to open up when they strike human tissue and create more damage. It was not possible to determine whether all the bullet fragments were from hollow point bullets.
N.C. was treated for a gunshot that entered her right shoulder, went into her chest, and out her back. She had a collapsed lung and bruising on her hip where a bullet lodged in her ID card. Smith was treated for multiple gunshot wounds. At least four bullets struck him, causing approximately eight bullet wounds. Smith suffered internal bleeding, and received 27 blood transfusions. Two bullets were not able to be removed because they were lodged too close to his spine. Smith's spleen and part of his left lung were removed. Smith was in the hospital for two weeks, then was transferred to a rehabilitation hospital.
Defendant testified at trial. He admitted taking a gun into a bar and shooting it. He argued he acted in self-defense. He stated that sometime after the fight, but before the shooting, he heard from an acquaintance that Smith admitted being a little *814 drunk the night of the fist fight, and that he said *31 everything was "cool." Defendant took this to mean everything was not cool. The night of the shooting, Defendant saw Smith at LaSalle's Bar standing and talking to his friends. Smith started walking toward defendant. Defendant thought Smith was coming after him, so he pulled out his gun. Defendant claimed he fired two shots into the air as a warning.[2] When Smith kept coming toward him, he brought the gun down and started shooting at Smith. Defendant claimed he fired nine times, and the last three times were into the ground next to Smith. He claimed he saw no one around Smith, and that his whole focus was on Smith.
The jury was unable to reach a verdict on count 1, the attempted murder of Smith. The jury found defendant not guilty of count 2, the attempted murder of N.C., but guilty of the lesser included offense of attempted voluntary manslaughter. The jury found defendant guilty of count 3, assault of N.C. with a semiautomatic firearm. The jury also found true the special allegations attached to count 3, that defendant personally used a firearm within the meaning of Penal Code[3] section 12022.5, subdivision (a), and personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). The prosecution later dismissed count 1 in the interest of justice.
The trial court stayed the sentence on count 2, attempted voluntary manslaughter. The court sentenced defendant to the upper term of nine years on count 3. The court also sentenced defendant to an additional 13 years for the enhancements, for a total aggregate sentence of 22 years.
DISCUSSION
I
Kill Zone Theory
A. Intent to Kill Requirement
Defendant challenges the theory of intent on which the prosecutor argued and the trial court instructed. The issue arises because both the attempted murder of N.C. and the attempted voluntary manslaughter of N.C., for which he was convicted, require an express intent to kill.
"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."
*32 ( People v. Lee (2003) 31 Cal.4th 613, 623, 3 Cal.Rptr.3d 402, 74 P.3d 176.) "Voluntary manslaughter requires either an intent to kill or a conscious disregard for life." ( People v. Bryant (2013) 56 Cal.4th 959, 970, 157 Cal.Rptr.3d 522, 301 P.3d 1136.) However, a conscious disregard for life will not suffice for attempted voluntary manslaughter, which requires an intent to kill. "[A]ttempted voluntary manslaughter cannot be premised on the theory defendant acted with conscious disregard for life, because it would be based on the 'internally contradictory premise' that one can intend to commit a reckless killing." ( People v. Gutierrez (2003) 112 Cal.App.4th 704, 710, 5 Cal.Rptr.3d 256.) Finally, the theory of transferred intent does not apply to attempts. "The crime of attempt sanctions what the person intended to do but did not accomplish, not unintended and unaccomplished potential consequences." ( Bland, supra , 28 Cal.4th at p. 327, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) Thus, to prove defendant was guilty of attempted murder or the lesser included offense of attempted voluntary manslaughter, the prosecution *815 had to prove that defendant had the intent to kill N.C.
To satisfy the element of intent to kill N.C., the prosecution relied on a "kill zone" theory, and the trial court gave a "kill zone" instruction. The "kill zone" instruction was in all material respects taken directly from CALCRIM No. 600 : "As to Count 2 only, a person may intend to kill a specific victim or victims and, at the same time, intend to kill everyone in a particular zone of harm or, quote, 'kill zone' end quote. [¶] In order to convict the defendant of the attempted murder of people on the dance floor in the back patio of LaSalles, the People must prove that the defendant not only intended to kill ... Smith but also either intended to kill people on the dance floor in the back patio of LaSalles, or intended to kill everyone within the kill zone."
B. Bland and Its Progeny
The "kill zone" theory had its genesis with Bland, supra , 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107. In that case, the defendant shot into a vehicle containing the driver and two passengers. ( Id. at p. 318, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) The driver was killed, and the two passengers were wounded, but not killed. ( Ibid. ) The court held that the doctrine of transferred intent does not apply to attempted murder. ( Id. at p. 328, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) The court explained that even though transferred intent does not apply to attempted murder, the defendant may concurrently intend to kill others within a "kill zone." ( Id. at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) " 'The intent is concurrent ... when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure *33 A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " ( Id. at pp. 329-330, 121 Cal.Rptr.2d 546, 48 P.3d 1107, quoting Ford, supra , 330 Md. at pp. 716, 717, 625 A.2d 984.)
Bland pointed to two other cases, which it considered "kill zone" cases. These were People v. Vang (2001) 87 Cal.App.4th 554, 104 Cal.Rptr.2d 704 ( Vang ), and People v. Gaither (1959) 173 Cal.App.2d 662, 343 P.2d 799 ( Gaither ). In Vang , the defendants shot 50 bullets at one occupied house, and an unspecified number of bullets at another occupied house. ( *816 Bland, supra , 28 Cal.4th at p. 330, 121 Cal.Rptr.2d 546, 48 P.3d 1107 ; Vang , at p. 558, 104 Cal.Rptr.2d 704.) The Court of Appeal affirmed attempted murder convictions as to everyone occupying both houses. ( Bland , at p. 330, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) In Gaither , the defendant mailed poisoned candy to his wife, and was convicted for the attempted murder of others living at the residence. ( Ibid. ) Bland held that the case before it was a "kill zone" case because the jury could reasonably have found "a concurrent intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone." ( Id. at pp. 330-331, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) Significantly, the Supreme Court's opinion gives no indication how many bullets were fired into the victims' car.
The Supreme Court further explained the "kill zone" or concurrent intent theory in People v. Smith (2005) 37 Cal.4th 733, 37 Cal.Rptr.3d 163, 124 P.3d 730 ( Smith ). In that case, the defendant fired a single bullet into a slow-moving vehicle driven by a female acquaintance of the defendant, and containing the driver's baby in an infant seat directly behind her. ( Id. at pp. 736-737, 37 Cal.Rptr.3d 163, 124 P.3d 730.) The bullet narrowly missed the mother and son. ( Id. at p. 736, 37 Cal.Rptr.3d 163, 124 P.3d 730.) The defendant argued his conviction for attempted murder of the baby should be reversed because there was no evidence he intended to kill the baby. ( Id. at p. 745, 37 Cal.Rptr.3d 163, 124 P.3d 730.) He claimed Bland's " 'kill zone' " theory did not apply because " '[t]his is not a bomb-on-the-airplane case or a rocket-propelled-grenade case or a hail-of-bullets case; this is a single-shot case.' " ( Ibid. )
*34 The Supreme Court responded that the " 'kill zone' " theory did not preclude two convictions of attempted murder where the defendant fired a single bullet injuring a woman and her baby, who were both in the defendant's direct line of fire. ( Smith, supra , 37 Cal.4th at p. 745, 37 Cal.Rptr.3d 163, 124 P.3d 730.) " Bland simply recognizes that a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.] As we explained in Bland , 'This concurrent intent [i.e., "kill zone"] theory is not a legal doctrine requiring special jury instructions.... Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.' " ( Id. at pp. 745-746, 37 Cal.Rptr.3d 163, 124 P.3d 730.)
In People v. Stone (2009) 46 Cal.4th 131, 92 Cal.Rptr.3d 362, 205 P.3d 272, the Supreme Court held that a shooter who fires a single shot into a group of people, intending to kill one of the group, but not knowing or caring which one, may be convicted of a single count of attempted murder. In People v. Perez (2010) 50 Cal.4th 222, 230, 112 Cal.Rptr.3d 310, 234 P.3d 557, the defendant shot from a slowly-moving vehicle into a group of seven police officers and one victim, hitting one of the police officers in the finger. The members of the group were standing between two and 15 feet away from the officer who was hit. ( Id. at p. 227, 112 Cal.Rptr.3d 310, 234 P.3d 557.) The court held, "a rational trier of fact could find that defendant's act of firing a single bullet at a group of eight persons from a distance of 60 feet established *817 that he acted with intent to kill someone in the group he fired upon." ( Id. at p. 230, 112 Cal.Rptr.3d 310, 234 P.3d 557.) However, the evidence was insufficient to sustain the conviction for seven more counts of attempted murder, the defendant having fired only one bullet. ( Id. at pp. 230-231, 112 Cal.Rptr.3d 310, 234 P.3d 557.)
At the appellate level, courts have disagreed on whether the "kill zone" theory supporting an attempted murder conviction may be used where the method of killing is not designed to ensure the death of everyone in the "kill zone," as opposed to a method that merely creates an extremely high risk of killing those in the zone of danger. In People v. McCloud (2012) 211 Cal.App.4th 788, 793-794, 149 Cal.Rptr.3d 902 ( McCloud ), two defendants shot a total of 10 bullets from their position in a parking lot into a crowded indoor party, killing two people and wounding another. One of the defendants was convicted of 46 counts of attempted murder. ( Id. at p. 792, 149 Cal.Rptr.3d 902.) The court expressed the view that a defendant cannot be convicted of attempted murder unless the method used was designed to kill everyone in the "kill zone." The court stated: "The kill zone theory thus does not apply if the evidence shows only that the defendant intended to kill a particular targeted individual but *35 attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury. Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual. Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual by killing everyone in the area in which the targeted individual was located. The defendant in a kill zone case chooses to kill everyone in a particular area as a means of killing a targeted individual within that area. In effect, the defendant reasons that he cannot miss his intended target if he kills everyone in the area in which the target is located. [¶] ... In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant specifically intends that everyone in the kill zone die. If some of those individuals manage to survive the attack, then the defendant-having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result-can be convicted of their attempted murder." ( Id. at p. 798, 149 Cal.Rptr.3d 902.)
McCloud held that the evidence did not support 46 attempted murder convictions. "In order for the kill zone theory to support 46 attempted murder convictions in the manner suggested by respondent, the record would have to contain evidence that Stringer and McCloud tried to kill the person who punched Stringer by killing all 46 people in the area where Stringer's assailant was located. But the record contains no evidence that Stringer or McCloud intended to kill 46 people with 10 bullets. Nor does the record contain evidence that it would have been possible for them to kill 46 people with 10 bullets (given the type of ammunition and firearm they used), or that they believed or had reason to believe it was possible." ( McCloud, supra , 211 Cal.App.4th at pp. 799-800, 149 Cal.Rptr.3d 902.)
Despite McCloud's restrictive view of the type of kill power the defendant would have to employ to warrant a "kill zone" instruction, the court found sufficient evidence to support a conviction for eight attempted murders, i.e., the 10 shots fired by the defendant convicted of the attempted *818 murders, less two for the two victims who were killed. ( McCloud, supra , 211 Cal.App.4th at p. 807, 149 Cal.Rptr.3d 902.)
Likewise, in People v. Cardona (2016) 246 Cal.App.4th 608, 201 Cal.Rptr.3d 189, the defendant was convicted of one count of murder and one count of attempted murder when he fired five or six shots at close range, killing the target, and wounding a bystander. ( Id. at p. 611, 201 Cal.Rptr.3d 189.) The court agreed it was error to give the "kill zone" instruction. ( Id. at p. 612, 201 Cal.Rptr.3d 189.) The court stated: "The shooting took place in a crowded party, but no witness testified that Cardona sprayed everyone near [the primary target] with gunfire. Without *36 evidence of an attempt by Cardona to kill everyone in a particular area in order to kill [the primary target], it was error for the trial court to give the kill zone instruction." ( Id. at p. 615, 201 Cal.Rptr.3d 189.) Even though Cardona concluded it was prejudicial error to give a "kill zone" instruction, it held there was sufficient evidence to sustain an attempted murder conviction because the jury could have concluded that the defendant aimed at least one of his shots at the bystander. ( Id. at p. 617, 201 Cal.Rptr.3d 189.) Further, the act of firing toward a victim at close range in a manner that could inflict death is sufficient to support an inference to kill. ( Ibid. )
On the other hand, People v. Tran (2018) 20 Cal.App.5th 561, 229 Cal.Rptr.3d 152, held that the "kill zone" instruction was properly given where the defendant fired a "hail of bullets" (five) into a car, killing one person and wounding another, because he "intentionally exposed everyone in the vehicle to mortal danger." ( Id. at pp. 564, 567, 229 Cal.Rptr.3d 152.) Also, the Supreme Court has granted review in People v. Canizales (Sept. 10, 2014, E054056) [nonpub. opn], review granted November 19, 2014, S221958, in which the Court of Appeal opined that McCloud went "too far." ( Id. at p. 825.) "If, as McCloud asserts, the defendant must in fact intend to kill each attempted murder victim, there is no reason to employ the theory-the intent to kill is established without resort to the theory." ( Ibid. )
C. Substantial Evidence
Defendant argues the "kill zone" theory was not supported by substantial evidence in that his behavior does not support the inference he intended to kill everyone in the zone.
" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence-that is, evidence that is reasonable, credible, and of solid value-from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] ... '[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may ... be inferred from the defendant's acts and the circumstances of the crime.' [Citation.]" ( People v. Avila (2009) 46 Cal.4th 680, 701, 94 Cal.Rptr.3d 699, 208 P.3d 634.)
*37 Defendant first made this argument after the prosecution presented its evidence, when he moved for a judgment of acquittal on count 2, which at that time alleged that defendant "did unlawfully, and with malice *819 aforethought attempt to murder people in the back patio of LaSalle's."[4] Defendant argued the "kill zone" argument and instruction did not apply because the "kill zone" theory requires that the defendant intended to kill everyone in the "kill zone."
The trial court gave the following summary of the evidence before finding that there was sufficient evidence to support a "kill zone" theory:
"In this case, the evidence that has been presented to the Court is that there were 35 to 50 people on the back patio area. The evidence that has been presented shows that there were 10 shell casings, all in the area-I'm going to call it a cone shape or a V-shaped area, from the rear of the back patio near the DJ booth towards the fence and the bartender-the bar in the front of the back patio.
"The casings are along that zone. The area encompasses the dance floor and the fence and the bar towards the west of the back patio. [¶] ... [¶]
"The evidence, as presented so far, indicates that the defendant used a semiautomatic handgun; that the gun was pointed towards Mr. Smith; that he did not use a stabilizing hand to assist in his aiming; that he turned the firearm sideways at one point; that he fired from a distance at first and then approached the target victim, Mr. Smith.
"There is no evidence of spraying of bullets in a[n] indiscriminate manner. Or of a hail of bullets in an indiscriminate manner.
"The situation at the time of the ... shooting was dynamic. There were people dancing, moving about. There was music playing. There was strobe lights. And the number of shots fired were, approximately, 10.
"The evidence does show projectiles embedding into the fence behind the dance floor and near where Mr. Smith was standing, also, as well as some impressions on the concrete near Mr. Smith's body. [¶]
"[The] court does find that there is sufficient evidence to support a theory of a killing zone on the dance floor area.
*38 "But as charged, people in the back patio of LaSalles, it's excessively broad and includes people that would be outside of the killing zone."
Thereafter, the prosecutor moved to amend the information to conform to proof, and for the court to reconsider its entry of judgment of acquittal on count 2. The trial court granted the People's request for reconsideration and allowed count 2 to be amended to charge defendant with attempting "to murder people on the dance floor in the back patio of LaSalle's." As indicated, the prosecutor argued the "kill zone" theory and the trial court gave the "kill zone" instruction.
Defendant's argument is that there was insufficient evidence the nature and scope of his attack sufficed to create a "kill zone." He argues the "kill zone" theory is inappropriate unless the perpetrator caused the target's death by means that would ensure to "a near certainty" that everyone in the target's vicinity will also die. Defendant argues no such "overkill" was established here.
The "kill zone" theory is a way of expressing what some legal theorists have referred to as " 'oblique' " intention. ( In re Stonewall F. (1989) 208 Cal.App.3d 1054, 1061, footnote 7, 256 Cal.Rptr. 578, and *820 authorities cited therein, disapproved on another point in People v. Atkins (2001) 25 Cal.4th 76, 104 Cal.Rptr.2d 738, 18 P.3d 660.) "Direct intention is where the consequence is what you are aiming at. Oblique intention is something you see clearly, but out of the corner of your eye. The consequence is ... a side-effect that you accept as an inevitable or 'certain' accompaniment of your direct intent." (Williams, Oblique Intention (1987) 46 Cambridge L.J. 417, 420-421.) Of course, certain, never really means certain. Oblique intention is more a practical certainty-something higher on the scale than a high probability. (Ibid. )
The theory, as expressed in the Supreme Court cases to date, does not require the defendant to use such force as to ensure that everyone in the "kill zone" is killed. If that were the case, nothing short of an explosive device strong enough to kill, not maim, would ever suffice. Exposure to poison may not always be a lethal dose, and bullets, even bullets from an automatic weapon, may not always hit their target. Illustrative of this fact are the "kill zone" cases cited in Bland. Defendant Gaither was guilty of seven counts of administering poison with intent to kill when he sent a pound and a half of candy containing enough arsenic to kill 75 people to a home inhabited by seven people. ( Gaither, supra , 173 Cal.App.2d at pp. 665-667, 343 P.2d 799.) Defendants Vang and Yang were guilty of 10 counts of attempted murder when they shot 50 bullets at one house where the targeted victim was not present, but five people unrelated to the target were present (one died), and an unspecified *39 number of bullets at another residence where five people were present. ( Vang, supra , 87 Cal.App.4th at pp. 557-559, 563, 104 Cal.Rptr.2d 704.) In neither case could it be said to a certainty that everyone in the "kill zone" would die, and in fact, not everyone did.
"Kill zone" is a somewhat unfortunate term, since the implication is that the theory requires a physical space that is necessarily deadly to all that inhabit it. This does not adequately describe the case of poisoned candy that sickens or kills those who eat it, or the case of gunfire, however concentrated, directed toward multiple persons. In truth, the concept attempts to describe a level of culpability and risk that society is unwilling to tolerate. It describes a type of intent that is "a kind of knowledge or realization." (Williams, supra , 46 Cambridge L.J. at p. 421.) Clearly, a defendant cannot escape punishment for murder by asserting that when he planted a bomb on an airplane he only intended to kill one particular passenger. This is because even though such defendant did not desire the death of the other passengers, he knew (barring some intervening factor) that everyone on the plane would be killed. No one would argue that he did not intend his actions would result in their death, and therefore that he intended to kill them. Similarly, if the same defendant were to be prevented from detonating the bomb, no one would argue that he would not be guilty of the attempted murder of everyone on the plane.
In this case, as in Bland, Vang , Gaither , and Tran , it is not as clear as the bomb on the plane that defendant intended his actions would result in the death of people in Smith's vicinity. However, the circumstances of the shooting were such that defendant must be charged with knowing that anyone in the path of the lethal bullets could die, and knowing that others were in the path of the bullets. The relevant circumstances are: the shooting occurred in a bar; defendant shot across the bar toward a dance floor approximately 24 feet away where people were in motion; several people were in Smith's vicinity; a strobe light was going off; defendant *821 was shooting from a distance and moving as he fired; defendant was not stabilizing his gun hand to make his aim more precise; defendant fired 10 shots, and at least one of the bullets was a hollow point bullet that is designed to inflict maximum tissue damage. Defendant may not have wanted to kill N.C., but he is charged with knowingly engaging in lethal actions under circumstances in which the difference between life and death was mere inches. His actions were more than reckless. On a scale of probability between unlikely and certain, the chances that his actions would kill someone on the dance floor of the bar were sufficiently close to certain that a reasonable jury could conclude he intended to kill someone on the dance floor. There was sufficient evidence that defendant intended to kill people on the dance floor in the bar under a "kill zone" theory. *40 Defendant also argues there was insufficient evidence to adequately define the parameters of the "kill zone," and without such defined parameters, the evidence would only support an inference of implied malice based on a conscious disregard for life-insufficient for attempted murder. We disagree. As explained, the "kill zone" theory is an attempt to describe a defendant's knowledge and realization of risk, not a physical space. There was no requirement that the parameters of the "kill zone" be defined. There was certainly no such requirement here, where the victim of the attempted murder was, in fact, shot and seriously wounded.
D. "Kill Zone" Jury Instruction
Defendant argues that even if there was sufficient evidence to support a "kill zone" instruction, the instruction did not provide enough guidance for the jury to determine whether a "kill zone" existed and whether he used sufficient force to create such a zone. He argues the language of the instruction deprived him of due process. To the extent defendant complains that the instruction did not require the jury to determine the dimensions of the "kill zone," we have already held there is no requirement the parameters of the "kill zone" be defined.
Defendant did not object to the "kill zone" instruction. When the trial court's instruction is a correct statement of the law, defendant's failure to request an amplifying or clarifying instruction bars appellate review. ( People v. Ashmus (1991) 54 Cal.3d 932, 997, 2 Cal.Rptr.2d 112, 820 P.2d 214, abrogated on other grounds recognized by People v. Yeoman (2003) 31 Cal.4th 93, 117, 2 Cal.Rptr.3d 186, 72 P.3d 1166 ; People v. Johnson (1993) 6 Cal.4th 1, 52, 23 Cal.Rptr.2d 593, 859 P.2d 673, overruled on another ground in People v. Rogers (2006) 39 Cal.4th 826, 879, 48 Cal.Rptr.3d 1, 141 P.3d 135.) The trial court gave the standard instruction without material change. " 'The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel.' " ( People v. Kelly (1992) 1 Cal.4th 495, 535, 3 Cal.Rptr.2d 677, 822 P.2d 385.) In any event, there was no error in the instruction, as set forth above.
II-VII**
*41 DISPOSITION
The matter is remanded to the trial court to exercise its newly bestowed discretion regarding whether to strike the sentencing enhancement imposed pursuant to section 12022.5, subdivision (a). In all other respects, the judgment is affirmed.
We concur:
HULL, J.
HOCH, J.

She heard more than one, but less than five shots before turning to look.

None of the eyewitnesses confirmed this.

Undesignated statutory references are to the Penal Code.

Count 2 was originally charged as an attempt to murder N.C., but the trial court found there was insufficient evidence to hold defendant to answer that count. The prosecution refiled count 2 as indicated above.

See footnote *, ante .