Filed 1/4/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KEANDRE DION WINDFIELD et al.,<br><br>        Defendants and Appellants. | E055062<br><br>(Super.Ct.No. FVA900999)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed with directions.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant KeAndre Windfield.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Harquan Johnson.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland, Assistant

1

Attorney General, Peter Quon, Jr., William M. Wood, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Harquan Johnson and KeAndre Windfield were each convicted of one count of murder and one count of attempted murder, and assault with a semi-automatic firearm, along with gun discharge and gang enhancement allegations as to the murder and attempted murder counts. The charges arose from the shooting of two members of their own gang, the Ramona Blocc Hustlas, resulting in the death of one of them. Both were sentenced to prison for 90 years to life. They appealed raising various claims. In the original opinion, filed August 19, 2014, we affirmed the convictions for both defendants, but reversed Johnson's sentence pursuant to *People v. Gutierrez* (2014) 58 Cal.4th 1354, because, as a juvenile at the time of the crime, his sentence of 90 years to life was the functional equivalent of a term of life without possibility of parole and we directed other modifications of the sentence and abstracts of judgment.

On November 12, 2014, the California Supreme Court denied both defendants' petitions for review, but, on its own motion, issued a grant-and-hold of review as to defendant Johnson, for consideration pending review in *In re Alatriste,* S214652, *In re Bonilla,* S214960, and *People v. Franklin,* S217699. On May 26, 2016, the Supreme Court issued its decision in *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), and retransferred this case to our court with directions to vacate our opinion and to reconsider Johnson's sentence in light of *Franklin.* We vacated the original opinion and issued our second opinion on September 28, 2016, affirming those portions of our original opinion

2

pertaining to issues not subject to the grant and hold, and reconsidered Johnson's sentencing claim in light of *Franklin*.

Defendants again petitioned for review. This time, the Supreme Court granted review, deferring further action pending consideration and disposition of a related issue in *People v. Canizales*, which was then pending in the Supreme Court. Following the issuance of that opinion, the Supreme Court retransferred the cases back to this court with directions to vacate our opinion and to reconsider the cause in light of *People v Canizales* (2019) 7 Cal.5th 591, and *People v. Perez* (2016) 3 Cal.App.5th 612, 619. We again modified the judgment in accordance with the directions of the Supreme Court. (E055062, *People v. Windfield et al.,* (2020) formerly published at 44 Cal.App.5th 196.) Defendants again petitioned for review.

On April 22, 2020, the Supreme Court again granted review, and again transferred the matter to our court with directions to vacate our decision and reconsider the cause in light of Senate Bill No. 620 (Stats. 2017, ch. 682). The Supreme Court also de-published the decision. We now consider the matter in light of Senate Bill No. 620.

**FACTS**

Several months prior to June 2009, Marvin Moore and his best friend, Montoyea Smith, went to a Ramona Blocc Hustlas (RBH) gang party. Smith got into a fight with two brothers, Quinn and Lamar Wise, who were also members of RBH, and were Moore's cousins. Defendant Windfield, also an RBH gang member, stepped in to help

3

the Wise brothers, and blindsided Smith with a punch. Moore was not actively engaged in the fight, but he and others separated Smith from Windfield and the Wise brothers.

On June 11, 2009, there was another RBH gathering at an apartment complex on East Jackson in Rialto. Ricky Peete, was there with three female companions. After midnight, Smith, a longtime friend of Peete's, drove up. Later, Moore pulled up and approached Smith. Smith was drunk and brought up the fight that had taken place a few months earlier, expressing anger that Moore had not stepped in the help him. The two men argued for a while about how Moore had failed him. Smith pulled out a hand gun and cocked it, stating he wanted to shoot up the Ramona gang's neighborhood.

After Smith displayed the gun, a van pulled up and parked across the street from where Smith and Moore were arguing. The driver was defendant Windfield's sister, Jontre Windfield (Jontre). Defendants Windfield and Johnson were in the van along with M. G. (the van's owner) and her children, and two other RBH gang members. When the van parked, defendant Windfield got out and began to cross the street. When Smith saw Windfield, he started yelling that Windfield had jumped him and pointed his gun at Windfield. Windfield walked at a fast pace back toward the van, as defendant Johnson got out of the vehicle. Smith chased both defendants around the van until the defendants ran away through an alley.

Jontre and M. G. exited the van and Jontre yelled at Smith that there were women and a child in the van. Smith pointed the gun in her face. Moore and Peete intervened, restraining Smith, and the women got back into the van and drove away as Smith walked

4

back across the street. Jontre and M. G. then picked up the defendants and another of the men who had left through the alley. As she drove back to the apartment on East Ramona Drive, where she and the defendants lived, Jontre told defendants that Smith had pointed his gun at her and stated several times that Smith had to die. Windfield was angry at being chased away by Smith and said Smith had to be taken care of that night. After the van left East Jackson, Smith put his handgun in his car and calmed down.

Minutes later, when the van arrived at the Ramona Drive residence, everyone went inside except defendants. Johnson and Windfield each retrieved a firearm, took the keys to the van from its owner, M.G., and left, after Windfield said that they were returning to East Jackson.

Meanwhile, at the East Jackson apartment building, the police arrived in response to a call about a fight, so Moore told Smith to put his gun away. The people who were out on the street scattered at the arrival of police, leaving Moore and Nikki R. (Nikki), outside. Moore and Nikki told police that the people involved in the fight had dispersed, so the officers drove away. Smith then returned to the street where Moore talked to him for about five minutes before driving away. Then Peete came out and talked to Smith.

While Peete and Smith were talking, Nikki heard the gate at the back of the building slam and went to investigate. She saw defendants Windfield and Johnson in the courtyard with guns and she told them they should leave, but they declined. Nikki walked back towards the front of the building while the defendants stayed in the back. Nikki told Peete what she had seen, but not Smith. When Smith started walking toward

5

the back, Nikki and Peete tried to stop him, telling him to go home, but Smith said he needed to get his marijuana from the back. Peete went with him and they walked shoulder to shoulder.

As Smith pushed past Nikki and Peete, defendants stepped forward and began firing rapidly. Peete and Smith turned and stumbled into each other, and both fell. Peete was hit in the leg and Smith fell on top of him, bleeding from his midsection. As Peete and Smith lay on the ground, defendant Windfield stood over them, placed his gun to Smith's head, and fired a final shot. Then the defendants left.

After the defendants left, Peete, who had been shot once in the leg, got up, and left in the car that Jontre had lent him earlier. Nikki ran into the East Jackson apartment and told those present that defendants had run from the alley into the apartment courtyard and shot Smith. Moore left the East Jackson Street apartment complex and drove to the Windfields' Ramona Drive residence to apologize to Windfield for Smith's behavior. Windfield said Smith was dead, and that "he had to go." However, Windfield told Moore that it was Johnson who shot Smith, not him. Moore left.

M. G. was at the Ramona Drive apartment when the defendant's returned, approximately one-half hour after they had left with the firearms. Johnson asked M. G. to go to the Hustla Squad hood to drop his clothes off there, in order to implicate the Hustla Squad in the shooting.[1]

---

[1] In 2008, Windfield was involved in and subsequently convicted of murder and attempted murder in the same gang related incident that led to the Supreme Court's decision in *People v. Canizales, supra,* which involved the Hustla Squad.

6

Afterwards, Windfield and Johnson discussed the shooting in the living room. Windfield said he shot all his bullets at Smith, and Johnson demonstrated how he walked over to Smith after he fell to the ground and shot him in his chest and face, holding the gun in both hands. During this conversation, Jontre got a call from Peete who told her he had been shot. Peete arrived at the apartment shortly after the call, limping and bleeding. Jontre drove Peete first to his mother's house and then to the hospital. During the drive to Peete's mother's house, Jontre said Smith had to die for putting the gun in her face.

The next day, at the Ramona Drive apartment, M. G. saw Windfield with Peete, who was on crutches, outside the apartment. Windfield told Peete they had not intended to shoot him. Back inside the apartment, Windfield told M. G. "he [Smith] had to go," because he had Windfield running like a "bitch."

Smith had been hit by at least 10 shots, six of which would have been fatal individually, including a shot fired approximately one-half inch from Smith's head. The cause of death was multiple gunshot wounds. Six bullets were recovered from Smith's body, all consistent with .25 caliber bullets. Peete had one bullet wound on the inside of his right calf. A criminalist who processed the scene hours after the shooting recovered seven .25 caliber casings and one nine millimeter casing.

Defendants were each charged with murder (Pen. Code, § 187, subd. (a), count 1),[2] attempted premeditated and deliberate murder (§§ 664, 187(a), count 2), and assault with a semiautomatic firearm (§ 245, subd. (b), count 3). It was further alleged that in the

---

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

commission of counts 1 and 2, that each defendant personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)), and that as to both defendants a principal personally and intentionally discharged a firearm which proximately caused death (§ 12022.53, subds. (d) & (e)(1), as well as an allegation that the murder and attempted murder were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). It was further alleged that in the commission of count 3, the defendants committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)).

Following a trial by jury, defendants were convicted of all three counts. The jury set the degree of the murder count respecting Smith at first degree, and found the attempted murder of Peete was premeditated and deliberate. The jury found the defendants had personally used and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)) and that a principal personally discharged a firearm causing death (§ 12022.53, subds. (d) & (e)(1)). As to both counts 1 and 2, the jury found that defendants committed them for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The jury also convicted defendants of count 3, assault with a semiautomatic firearm (§ 245, subd. (b)), during which they personally used a firearm (§ 12022.5, subd. (a)) and which they committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)). The defendants were each sentenced to aggregate indeterminate terms of 90 years to life on counts 1 and 2, while the term on count 3 was stayed pursuant to section 654.

Defendants appealed their convictions and sentences arguing:[3] (1) that the admission of the preliminary hearing testimony of Nikki impinged on their rights to confrontation; (2) that their sentences were cruel and unusual given their youth; (3) the evidence of specific intent to kill was insufficient to support the conviction for attempted murder on count 2 based on a "kill zone" theory; (4) the court erred in failing to instruct the jury that provocation could reduce the attempted premeditated murder to attempted murder; (5) the firearm use and discharge allegations must be stricken as to count 2 because the amended information omitted such enhancements; and (6) clerical errors on the abstract of judgment required amendment. Separately, Johnson argued that (1) the court failed to pronounce sentence; and (2) he was entitled to additional presentence custody credits.

Following the first appeal, we affirmed the substantive convictions as to both defendants, but we directed the trial court to strike the allegation that a principal used and discharged a firearm as to count 2, affirmed the sentence as to Windfield, who was 18 at the time of the crimes, but ordered resentencing on Johnson, who was under the age of 18, pursuant to *People v. Gutierrez* (2014) 58 Cal.4th 1354, directed modification of Johnson's presentence credits, and amendment of the abstracts of judgment.

Defendants petitioned for review but their petitions were denied. However, on the Supreme Court's own motion as to Johnson, the Supreme Court granted review but deferred briefing pending consideration and disposition of a related issue in *In re*

---

[3] Windfield originally argued only two issues in his opening brief, but he joined Johnson in the remaining substantive issues.

*Alatriste,* S214652, *In re Bonilla,* S214960, and *Franklin,* S217699. After the decision in *Franklin* was filed, the matter as to Johnson was returned to us with directions to vacate our decision and reconsider the cause in light of *Franklin.* On September 28, 2016, we published our second opinion, republishing the portions of the opinion unaffected by the grant of review, but affirming in part and reversing in part as to Johnson. Both defendants again petitioned for review.[4]

On January 11, 2017, the California Supreme Court granted the second set of petitions for review, but deferred further action pending consideration and disposition of the related issue in *People v. Canizales,* S221958 (now at *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*)). Following the issuance of the decision in *Canizales,* the Supreme Court retransferred the matter to us with directions to vacate our decision and reconsider the cause in light of *Canizales, supra,* and *People v. Perez* (2016) 3 Cal.App.5th 612, 619. We vacated our opinion pursuant to the Supreme Court's directions, filing our modified opinion on January 15, 2020, which was certified for publication.[5]

Defendants again petitioned for review, and again the Supreme Court granted review. This time, the cause was retransferred to us for reconsideration in light of Senate

---

[4] We reversed and remanded Johnson's sentence. With the benefit of the developing body of law on the *Franklin* issue, we have modified the disposition to reflect a remand for a hearing at which Johnson may make a record of his youth as mitigation under *Franklin.*

[5] The opinion was previously published as *People v. Windfield* (2020) 44 Cal.App.5th 196.

Bill No. 620, another law enacted after the defendants had been convicted of their crimes. We vacated our opinion pursuant to the Supreme Court's directions, and now re-issue the prior opinion with further modification in light of the enactment of Senate Bill No. 620, which modified section 12022.53, subdivision (h), to permit a trial court to exercise its discretion to strike or dismiss a gun discharge enhancement.

**ISSUES AND DISCUSSION**

1. *Admission of Nikki's Preliminary Hearing Testimony*

Both defendants argue that the court erred in admitting the audio and video recording of the preliminary hearing testimony of Nikki because the People failed to demonstrate she was unavailable, and failed to exercise due diligence to secure her attendance. We disagree.

We determine de novo whether due diligence was demonstrated. (*People v. Bunyard* (2009) 45 Cal.4th 836, 851; *People v. Cromer* (2001) 24 Cal.4th 889, 892, 893 (*Cromer*).)

a. *Background*

After testifying at the preliminary hearing, Nikki moved out of state with financial assistance provided by the District Attorney's office. The state to where she moved was where her mother and sister lived. She provided her address to a District Attorney Investigator, Christine Murillo, who spoke to Nikki by phone to confirm she had arrived safely. The investigator did not recontact Nikki until 2010.

11

In October 2010, Murillo checked various automated databases in both California and the state to which Nikki had moved and found no new information. Murillo contacted an investigator for the prosecutor's office in the state where Nikki had relocated to request follow-ups on all the addresses found. The investigator for the out-of-state jurisdiction checked every address that had been found for the next two to three weeks. Nikki had not been living at her last known address for 30 days before contact was made with the manager at the apartment complex where she had lived.

The investigator for the local prosecutor's office, in the state to which Nikki had relocated, checked with Nikki's relatives in that area; however, they had not seen or heard from Nikki for several weeks. That investigator for the local prosecutor's office went to the social service agency that provided money to Nikki while she was living in the place where she had relocated and was informed that she had failed to appear for her last couple of appointments with the agency to pick up funds it had for her.

In November 2010, Murrillo called Nikki's friend, Jasmine, who said that she had heard from Nikki three weeks before, but had no way to contact Nikki. Murillo contacted Jasmine a second time a few weeks later, but Jasmine reported that she had not heard from Nikki and had no contact information for her. Jasmine, again, told the investigator that she would have Nikki call the investigator if Nikki contacted her. Murillo also called Detective Williams, the case agent, in November 2010, and asked him to contact her if he heard anything on the street about Nikki's whereabouts. In January, April, and May

2011, Murillo reran Nikki through the available automated systems in California and the state to which Nikki had relocated.

Detective Williams had not tried to stay in contact with Nikki after she relocated, following the October 2009 preliminary hearing, but the prosecutor asked him to locate Nikki in the fall of 2010. Starting in September 2010, and for more than three months, he spoke to 50 or 60 people in Rialto and surrounding communities who may have known Nikki. Information from these people led the case agent to believe that Nikki might be local, so he notified the agencies in the areas surrounding Rialto and he talked to family members, all of whom denied knowing her whereabouts.

Within six or seven months before the hearing, the case agent searched all the places in San Bernardino and Riverside Counties where people said Nikki would reside or frequent on a regular basis. Six months before the hearing, the case agent contacted one of Nikki's aunts, but got no information. On and off since January 2011, the case agent had checked the Web site, Accurant, and Nikki's name came up at several locations linked to family members. Williams and another detective conducted stakeouts at those locations several times to see if they could determine Nikki's whereabouts. From three months before the hearing, Williams tried just about every day to contact Nikki by telephone and by contacting law enforcement agencies.

Approximately two months before the hearing, Williams put Nikki's information into the Criminal Identification and Information database, with a flyer, so that if she were stopped by the police, the officer who stopped her would have the information that Rialto

13

Police Department should be contacted. The flyer was still active at the time of the hearing. Within the last two weeks before the hearing, Williams visited another of Nikki's aunts and contacted several other family members who lived locally. The aunt dialed a phone number for Nikki's mother and sister, who lived out of state, and Williams spoke to them in the presence of the aunt. They reported she had lived in the apartment complex where they resided. Williams had the local police go there, but learned Nikki had moved within the previous month.

However, the local police did learn that Nikki had been in a vehicle that had been ticketed. Williams checked the license number of that vehicle and tracked it to a different state. Two weeks before the hearing, Williams asked that state's local law enforcement go the address of the registered owner of the car, but the owner claimed not to know Nikki. The trial court ultimately found the case agent's testimony to be credible.

The prosecutor explained its failure to contact Nikki between the time of her relocation and October 2010 was due to its belief they were on good terms with her and she had no criminal convictions then or at the time of trial. Because Nikki was in a place where she was surrounded by family members, the prosecutor believed her office would be able to contact Nikki.

The trial court found that Nikki was a critical witness, the only eyewitness to the crime. It noted that her testimony had been videotaped, as was common in gang cases, so it could be seen and heard, rather than merely read. The court concluded that the

14

prosecution had established due diligence and permitted the People to play the videotape to the jury.

b. *Discussion*

On appeal, both defendants argue that the People did not employ "due diligence" in efforts to secure Nikki's attendance. We disagree.

Under both the federal and state Constitutions a criminal defendant is guaranteed the right to be confronted with the witnesses against him. (U.S. Const., 6th Amend.; *Pointer v. Texas* (1965) 380 U.S 400, 403-405 [13 L.Ed.2d 923, 85 S.Ct. 1065] [confrontation clause is applicable to the states].) "If a witness is unavailable at trial and has given testimony at a previous court proceeding against the same defendant at which the defendant had the opportunity to cross-examine the witness, the previous testimony may be admitted at trial." (*People v. Sánchez* (2016) 63 Cal.4th 411, 440.) Prior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine and if the government has established the unavailability of the witness. (*Crawford v. Washington* (2004) 541 U.S. 36, 57, 59 [158 L.Ed.2d 177, 124 S.Ct. 1354], citing *Mattox v. United States* (1895) 156 U.S. 237, 244 [39 L.Ed. 409, 15 S.Ct. 337].)

In a criminal case, the prosecution bears the burden of showing that the witness is unavailable and that it made a "good-faith effort" (*Barber v. Page* (1968) 390 U.S. 719, 725 [20 L. Ed. 2d 255, 88 S. Ct. 1318]), or, in the alternative, exercised reasonable or due diligence to obtain the witness's presence at trial. (*People v. Cromer* (2001) 24 Cal.4th

889, 892 (*Cromer*).) In this state, the exception to the confrontation right for prior recorded testimony is codified in Evidence Code, section 1291, subdivision (a), which provides, in part, that former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the party against whom the former testimony is offered was a party to the action or proceeding and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.

Evidence Code section 240 governs unavailability of a witness. In part, that section provides that the term "unavailable as a witness," means "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).)

"Due diligence" is not capable of a mechanical definition, but "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." (*Cromer, supra,* 24 Cal.4th at p. 904.) Relevant considerations include "'whether the search was timely began'" [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation]." (*Ibid.*) In determining whether the People have exercised due diligence, the court considers the timeliness of the search, the importance of the witness's testimony, and whether leads were competently explored. (*Ibid.*)

In *People v. Fuiava* (2012) 53 Cal.4th 622 (*Fuiava*), the trial court permitted the prosecution to introduce at trial the preliminary hearing testimony of a witness who was parked in a car at the time of the shooting, heard the gunshots, and saw the defendant and others running near the scene of the shooting. The homicide detective was tasked with locating the witness and serving a subpoena on her to procure her testimony at trial, and began the process of locating her two weeks before the date set for the trial. He checked her two last known addresses, interviewed neighbors, and checked the records of the Department of Motor Vehicles, but learned of no new addresses. He checked hospital and jail records on a regular basis and gave patrol deputies her photograph and description, so they would be on the lookout for her. (*Id.,* at pp. 675-676.)

Based on this evidence, the reviewing court in *Fuiava* concluded that the trial court had properly determined that the prosecution had exercised reasonable diligence in attempting to locate the witness. (*Fuiava, supra,* 53 Cal.4th at p. 676.) Specifically, the Court of Appeal held that the detective began his search within a reasonable period of time before trial, and that it would have been unreasonable to impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case. (*Ibid.*)

In reaching that conclusion, the court distinguished the holding of *People v. Louis* (1986) 42 Cal.3d 969, a case on which the defendants in this case have relied. In *Louis,* the California Supreme Court held that the People did not exercise due diligence because the prosecutor took no steps to prevent the absence of the witness. The defendants focus on the Supreme Court's observation in *Louis* that the prosecution had a duty to use

17

reasonable means to prevent a witness from becoming absent. (*Id.,* at p. 991.) However, in that case, the witness was known to be unreliable and his credibility was suspect. Ordinarily, however, the prosecution is not required, "absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures to stop the witness from disappearing.' [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 342.)

Unlike the witness in *Louis,* Nikki had no criminal background and there was no indication she would disappear. While the prosecution actually assisted Nikki in leaving the state to move to another state where her mother and sister resided, there was no good cause to believe she would flee and every reason to believe she would be cooperative, where her credibility was not suspect and she was not considered unreliable at the time of her move. Further, the search for Nikki was timely undertaken and leads were competently explored.

The defendants criticize the detective's attempts to search for Nikki locally when he knew she had been relocated to another state. However, Detective Williams testified that information he gathered led him to believe that Nikki was local and people had told him that they had seen her in the area within six months before the hearing. This was consistent with Williams's testimony that after the preliminary hearing in Windfield's other criminal case in September 2010, law enforcement became concerned that Nikki had disappeared from where she had been relocated. It was reasonable for Williams to search for her locally based on the information available to him.

18

Defendants also criticize the prosecution for not contacting hospitals and medical establishments in the state where she was relocated, but the prosecution checked with the welfare agency that was providing funds to her. Any application for medical coverage at public expense would have been noted by that agency, and defendants have not established that Nikki was indeed hospitalized, so there is no reason to believe that such a check would have yielded information about her whereabouts. Defendants cite no authority requiring the prosecution to engage in such a search absent a reason believe it would yield useful information, and we have found no authority requiring the prosecution to engage in such a fishing expedition to meet the diligence standard. Moreover, given the current status of HIPAA (Health Insurance Portability and Accuracy Act of 1996), we doubt that it would have been easy for law enforcement to obtain information about Nikki from medical providers.

As to defendants' suggestion that clinics and hospitals should have been contacted to determine if the child she was carrying at the time of the crimes received treatment at any of those facilities, the record shows that trial counsel for Johnson informed the court that that child had been taken from Nikki by the local Department of Children and Family Services and given to the child's father. The trial court correctly determined that the prosecution used due diligence in attempting to locate Nikki.

Nikki was unavailable as a witness and the parties against whom the former testimony was offered were parties to the action or proceeding and had the right and

19

opportunity to cross-examine the declarant with an interest and motive similar to that which they had at the trial.

Even if we disagreed with the court's due-diligence determination, any error was harmless beyond a reasonable doubt. Although Nikki did not testify in person, her testimony at the preliminary hearing had been videotaped, and the tape was played for the jury. The jury was thus able to view her and make credibility determinations from her demeanor as recorded.

Additionally, other witnesses corroborated Nikki's testimony. M. G. saw both defendants with guns shortly before the shooting at the Ramona Street address and heard Windfield state they were going back to East Jackson because Smith had Windfield "running like a bitch," and that Smith would be taken care of that night. A half hour later, the two defendants returned and Johnson asked M. G. to drive him to some apartments in Rialto to drop his clothes off, so as to make it look like someone in the "Hustler Squad" had killed Smith. Johnson admitted to M. G. that he and Windfield had shot Smith. She heard Windfield say he shot Smith at least four times and heard Johnson admit that he shot Smith in the face. The next day, M. G. was present when Windfield told Peete they had not intended to shoot him. These statements alone would have been sufficient to support the convictions.

While the trial court found that Nikki was a critical witness, important portions of her testimony were corroborated by other witnesses and there was ample evidence aside

20

from her testimony supporting the convictions despite the fact she was impeached with inconsistent statements she had made.

In any event, to the extent defendants assert that an *extraordinary* showing of due diligence was required because of her value to the prosecution (see *People v. Herrera* (2010) 49 Cal.4th 613, 622), such a showing was, in fact, made. There was no error.

2. *Insufficiency of the Evidence of Intent to Kill Under the "Kill Zone" Theory.*

Defendants contend that there was insufficient evidence to support a finding of specific intent to kill in connection with the attempted murder count. Specifically, they argue there was insufficient evidence that defendants created a kill zone by firing their guns and that the attempted murder victim was in that zone. We were directed by the Supreme Court to reconsider the matter in light of *Canizales, supra*, and after doing so, we conclude that the kill zone theory was correctly applied here.

It is well-settled that to prove the crime of attempted murder, the prosecution must establish "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be "transferred" from one attempted murder victim to another under the transferred intent doctrine. (*People v. Bland* (2002) 28 Cal.4th 313, 327–328 (*Bland*).) However, the doctrine of transferred intent does not apply to attempted murder. (*People v. Souza* (2012) 54 Cal.4th 90, 120.)

21

In *Bland, supra,* the California Supreme Court expressly embraced the concept of a concurrent intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder.  Under that theory, the nature and scope of the attack directed at a primary victim may raise an inference that the defendant "'intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.'" (*Bland*, *supra*, 28 Cal.4th. at p. 329, quoting *Ford v. State* (1993) 330 Md. 682 [625 A.2d 984, 1000].)  The Supreme Court explained that "'[w]here the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (*Bland, supra*, at p. 330, quoting *Ford, supra*, at p. 1001.)

The kill zone theory embraced by *Bland,* as it relates to multiple attempted murder charges, is necessarily defined by the nature and scope of the attack.  (*People v Perez* (2010) 50 Cal.4th 222, 232.)  It could lead to some anomalous results, such as in *Perez,* where a defendant was convicted of eight counts of attempted murder after firing a single shot at a group of police officers standing in close proximity with each other, and 60 feet away from defendant.  There, the court held that the nature and scope of defendant's attack on the group had not created a zone of fatal harm around them and that *Bland* did not apply.  (*Perez, supra*, 50 Cal.4th at p. 232.) "The indiscriminate firing of a single shot at a group of persons, without more, does not amount to an attempted murder of everyone in the group." (*Ibid*.)  Thus, a single count of attempted murder could stand, but not eight counts.  Of course, this did not mean that defendant's act of endangering the lives of the

22

other individuals in the group would not go unpunished, where Perez was properly convicted of multiple counts of assault with a semiautomatic firearm on a peace officer.

We note that at least one single-bullet case that gave rise to two counts of attempted murder has been affirmed, where the defendant fired from behind the car in which a mother was driving and her baby was in a car seat directly behind her. (*People v. Smith* (2005) 37 Cal.4th 733, 736-737.) However, that case was not resolved by resorting to the "kill zone" theory.

In *People v. McCloud* (2012) 211 Cal.App.4th 788, the Court of Appeal held it was error to instruct on the kill zone theory of liability for attempted murder where the defendant was convicted of 46 counts of attempted murder after firing 10 shots from a semiautomatic handgun at a party where over 400 people were present. The reviewing court held that the kill zone theory is not an exception to the mental state requirement for attempted murder. It went on to hold that in order for the kill zone theory to support all 46 convictions, the record would have had to show that defendant tried to kill a targeted person by killing all 46 people in the area where the targeted individual was located. (*Id.,* at p. 798.) At the appellate level, other courts have disagreed on whether the kill zone theory may be used where the method of killing is not designed to ensure the death of everyone in the kill zone. (See *People v. Warner* (2019) 35 Cal.App.5th 25, 35.) For this reason, the Supreme Court granted review on this case and others involving the "kill zone" theory.

The Supreme Court resolved these disagreements in *Canizales, supra*. In that case*,* codefendant Windfield (who is also a defendant in the present case) fired five shots in the general direction of two rival gang members, Pride and Bolden, from across the street, a distance of either 100 or 160 feet away. One of his bullets struck an innocent bystander who was near her parked car. The defendants were convicted of one count of murder and two counts of premeditated attempted murder as to Pride and Bolden.

The Supreme Court concluded "that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm— that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. (*Canizales, supra,* 7 Cal.5th at p. 607.) In other words, the kill zone theory applies when the evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm. However, it reversed the attempted murder convictions as to both defendants because there was insufficient evidence to support an instruction on the kill zone theory.

Specifically, the court held that an instruction on the kill zone theory would have been warranted "only if there was substantial evidence in the record that, if believed by

24

the jury, would support a reasonable inference that defendants intended to kill everyone within the 'kill zone.' To qualify, the record would need to include (1) evidence regarding the circumstances of defendants' attack on Pride that would support a reasonable inference that defendants intentionally created a zone of fatal harm around him, and (2) evidence that Bolden was located within that zone of fatal harm. Taken together, such evidence would permit a finding that defendants harbored the requisite intent to kill Bolden because he was within the zone of fatal harm that defendants intended to create around Pride." (*Canizales, supra*, 7 Cal.5th at pp. 609-610.)

For further guidance, *Canizales* instructs us that in determining the defendants' intent to create a zone of fatal harm and the scope of any such zone, "the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales, supra,* 7 Cal.5th at p. 607.)

In *Canizales,* the Supreme Court concluded that the evidence was insufficient to support a finding that the defendants intended to create a zone of fatal harm. It noted that whether the inference could reasonably be drawn depended on whether the evidence that neither of the two attempted murder victims was hit by any of the shots fired by Windfield (who was the shooter in that case a year before his involvement in the current

crimes). The defendants' lack of proximity to one of the attempted murder victims, and the openness of the area in which the attack occurred, also diminished any inference that the defendants intended to create a zone of fatal harm.

The present case is distinguishable. Here, the multiple shots by each defendant from semi-automatic firearms were fired at close range against two people who were walking side-by-side in such close proximity that they fell into each other. Although Smith was the targeted individual, the manner of shooting multiple times into the pair of victims who were in close proximity, even in a pile at one point, with semiautomatic firearms fired from close range, gives rise to the strong inference that defendants intended to create a zone of fatal harm and that each defendant harbored the requisite intent to kill both the primary target and everyone within the zone of fatal harm. Windfield's statement to Peete that he did not mean to shoot him rings hollow where he, as well as Johnson, fired at Smith repeatedly even after Smith had fallen onto Peete.

Defendants assert that there is insufficient evidence to support a kill zone theory because "[Johnson] and . . . Windfield waited for [the murder victim] to appear, and when he did appear they fired at close range a number of well-targeted shots designed to hit and kill only [the murder victim]." However, the evidence does not support their theory. The defendants both shot at close range, firing multiple times at Smith who fell on top of Peete. Whether or not the defendants intended to shoot Peete, the two victims were in such close proximity to each other and the defendants, that the only reasonable

26

inference is they intended to create a zone of fatal harm around Smith, and Peete was located within that zone.

We also disagree with defendants' categorization of the shots as "well-targeted, designed to hit and kill only [the murder victim]" under the circumstances here. Peete testified that just before the shots began, he and the murder victim were walking side by side, then he heard the first shot or shots, told the murder victim to hold up, then both turned and ran into each other, and while turning, facing each other, he got shot. He also testified when he went down after being shot, he thought the murder victim was still standing, but the latter fell on top of him. From this, it is likely that Peete got hit before the murder victim was hit, while he and the murder victim were very close to each other.

Additionally, in her preliminary hearing testimony, Nikki said that when Johnson and Windfield approached the murder victim, the attempted murder victim was holding him tightly by having one of his arms over the murder victim's shoulder[6] and after that, while Johnson and Windfield were shooting at the murder victim, the attempted murder victim was trying to cover or shield the murder victim, by standing between him and the defendants, and he moved his body as they moved, so they couldn't shoot the murder victim.

However "well-targeted" the defendants' bullets might have been intended, when another person is standing very close to the targeted victim, or has placed himself between the shooters and the targeted victim, acting as a shield for the latter, we cannot

_____

[6] She said he was trying to stop the murder victim from going any closer to where Nikki had warned him the armed defendants were.

27

imagine a more appropriate application of the kill zone theory, especially where, despite this, the shooters shot and actually hit that person. Contrary to defendants' assertion, the fact that the murder victim was hit with nine bullets (aside from the "coup de gras" to the head) and the attempted murder victim with only one does not disprove that the attempted murder victim was in the line of fire.

Defendants' attack Nikki's testimony that clearly established that the attempted murder victim was in the line of fire because, according to them, she "never gave a reliable description of precisely where the shooters were positioned when [the murder victim] was shot." We disagree. She described, with great precision, where the attempted murder victim was in relation to the murder victim, and the attempted murder victim's testimony corroborated at least part of this description (i.e., he testified that he told the murder victim to hold up as the first shot or shots were fired and this was consistent with Nikki's description that he was holding back the murder victim, and also he testified that the two ran into each other as he was hit with the bullet, which was not inconsistent with her perception that he was shielding the murder victim during the shooting). In any event, on a sufficiency of the evidence claim, we do not discount a witness's testimony unless it is so improbable as to be unworthy of belief (*People v. Thornton* (1974) 11 Cal.3d 738, 784, overruled on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 685, fn. 12), and Nikki's was not.

Defendants' assertion that the method used—a hail of bullets from two different guns—was insufficient to support the finding of specific intent is unreasonable. The very

28

fact that they created a hail of bullets at close range to two individuals who were either side by side, or with Peete in front of Smith, intending to kill Smith, is the very definition of creating a kill zone. Under these circumstances, the jury could reasonably infer that defendants "'used a means to kill the [murder victim] that inevitably would result in the death of other victims within the zone of danger.'" (*People v Stone* (2009) 46 Cal.4th 131, 138.)

As to the argument that the fact that Windfield apologized to the attempted murder victim, saying they did not intend to shoot him, defeated any inference the jury might draw that they intended to kill Peete, we note that the jury was perfectly free to reject this self-serving statement, and they apparently did so. If, as defendants assert, they were "being careful not to shoot" the attempted murder victim, they would not have shot while Peete was shielding Smith with his body, before shooting Smith.

The circumstances of the offense, the number of shots fired, the distance between the defendants and the alleged victims, and the proximity of the alleged victims to the primary target support application of the "kill zone" theory, even after the Supreme Court's clarification in *Canizales*. We conclude the evidence is sufficient to support the finding of specific intent to kill under the "kill zone" theory.

3. *No Error in Failing to Instruct on Provocation as to Attempted Murder.*

Defendants argue that the trial court's failure to instruct the jury *sua sponte* on provocation as to the charged attempted murder, similar to CALCRIM No. 522, requires reversal of the findings that the attempted murder was premeditated. We disagree.

29

Defendants recognize that two California Supreme Court decisions have held that there is no *sua sponte* duty to give CALCRIM No. 522. (*People v. Rogers* (2006) 39 Cal.4th 826, 880; *People v. Middleton* (1997) 52 Cal.App.4th 19, 32-33, [disapproved on other grounds in *People v. Gonzales* (2003) 31 Cal.4th 745, 752].) We are bound by Supreme Court decisions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.) This resolves the question of whether the trial court erred in failing to instruct on provocation vis-à-vis the attempted murder of Peete *sua sponte*.

As a fallback, defendants claim that their trial counsels' failure to request a CALCRIM No. 522-like instruction as to the charged attempted murder constitutes incompetency of counsel. In order to prevail, they must demonstrate a reasonable probability that, but for the failure to request this instruction, the outcome of this trial would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-694, 697-698.) That probability must be sufficient to undermine confidence in the verdicts. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

However, defendants cannot carry their burden. First, in order to show ineffective assistance of counsel, defendant must meet the two-prong standard under *Strickland*. It must be shown that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) that the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington, supra,* 466 U.S. at pp. 688, 693–696; *People v. Johnson* (2016) 62 Cal.4th 600, 653.) A successful claim of IAC must

30

include both substandard performance *and* counsel's deficient performance was prejudicial. (*People v. Hester* (2000) 22 Cal.4th 290, 296.)

Here, deficient performance cannot be established because there was no evidence that the offense was less than that charged and there was no evidence of provocation such as would warrant an instruction on that point. (See *People v. Breverman* (1998) 19 Cal.4th 142, 154, citing *People v. Hood* (1969) 1 Cal.3d 444; *People v. Noah* (1971) 5 Cal.3d 469, 479; *People v. Osuna* (1969) 70 Cal.2d 759, 767.) Because there was no evidence to support an instruction on provocation, there was no duty on the part of counsel to request such an instruction. (See *People v. Lewis* (2001) 26 Cal.4th 334, 363; *People v. Svarvas* (1983) 142 Cal.App.3d 511, 526.)

Here, the only evidence in the record relating to the defendants' mental states respecting the shooting of Peete is the evidence of Windfield's statement to Peete the day *after* the shooting, as reported by M.G., that they did not intend to shoot Peete. Had it not been for the defendants' acts of shooting into a "kill zone," this evidence might negate a specific intent to kill. But it also negates any theory of provocation respecting the attempted murder. After all, shooting a person by mistake is not tantamount to a provoked attack.

Further, the defense emphasized that Peete was unable to identify his shooters. An instruction on provocation was inconsistent with the theory that someone else may have shot him. There was no ineffective assistance of counsel.

31

We also observe that in convicting defendants of first degree murder, the jury was instructed on provocation sufficient to reduce the degree of murder to second degree, but necessarily rejected that theory in convicting of first degree murder.  This is true for either theory of first degree murder that was available to the jurors, whether premeditated and deliberate or lying in wait, as the latter, the jury was instructed, required "a state of mind equivalent to deliberation or premeditation."

Because the murder and the attempted murder were committed simultaneously, by the same acts and under the same circumstances and were interconnected by the use of the kill zone theory as to the latter, it would not be possible for the jury to conclude that some provocation reduced the attempted murder to nondeliberate, nonpremeditated attempted murder, but did not also reduce the murder to second degree murder.

Absent evidence of provocation sufficient to warrant the giving of an instruction, there was no basis for an instruction permitting the jury to consider it, and counsel's failure to request such an instruction cannot be deemed to be deficient in any way.  There was no error.

4. *Firearm Enhancement Allegations as to the Attempted Murder.*

Defendants argue it was error to impose the principal and personal firearm use enhancements, and the firearm-discharge-causing-great-bodily-injury enhancements as to count 2, because the amended information failed to allege the enhancements.  We disagree.

### a. *Background*

Count 2 of the first amended information correctly alleged that the defendants committed the crime of attempted murder, in violation of sections 664/187(a), a felony, by unlawfully, and malice aforethought, attempting to murder Peete. That count further alleged that the defendants personally and intentionally discharged a firearm which caused great bodily injury and death to Peete within the meaning of section 12022.53, subdivision (d), and that as to that count, a principal personally and intentionally discharged a firearm, causing great bodily injury and death, within the meaning of section 12022.53, subdivisions (d) and (e)(1). That information included a fourth count, alleging that both defendants were active participants in a criminal street gang, within the meaning of section 186.22, subdivision (a).

On June 7, 2011, the seventh day of trial, when voir dire was still occurring, the prosecutor told the trial court that she was taking out the great bodily injury allegation relating to count 2, pursuant to section 12022.7, and that she would not be refiling count 4. The prosecutor also indicated she would be adding the allegation that the attempted murder was willful, premeditated and deliberate. She said she would be filing an amended information to reflect these changes.

The following day, the prosecutor filed what was entitled the third amended information, although the record shows that no second amended information was ever filed. The so-called third amended information alleged, in connection with the charged attempted murder, that Johnson and Windfield had committed the crime of attempted

33

murder as to Smith, rather than Peete, that the attempted murder was willful, deliberate and with premeditated.

It went on to allege "as to count(s) 1" that the defendants "personally and intentionally discharged a firearm . . . , which caused death to [Smith] within the meaning of Penal Code section 12022.53[, subdivision] (d) . . . ." It also alleged as to this count that "a principal personally and intentionally discharged a firearm . . . , which proximately caused death to [Smith] within the meaning of Penal Code section 12022.53[, subdivisions] (d) and (e)(1)." It also alleged that the attempted murder had been committed for the benefit of a gang. Finally, it alleged that the victim of this count was the murder victim.

During arguments to the jury, on July 15, 2011, the prosecutor told the trial court that she wanted to make sure, by interlineations, that count 2 of the so-called third amended information "reflect[ed] Ricky Peete." The trial court said it would make that order. The trial court indicated it had earlier selected and given the jury instructions including instructions requiring the jury to make findings on the firearm allegations as to count 2 consistent with the allegations that appeared in the first amended information. Although no such interlineations appear in the record before this court, we assume that the third amended information was interlineated to substitute Peete's name for Smith's, where the verdicts name Peete as the victim. Up to this point, all versions of the information had included enhancement allegations under section 12022.53, subdivisions (d) and (e)(1), specifying that the attempted murder was the subject of these allegations.

When the jury returned its verdicts, it found, in connection with the attempted murder, that both defendants had personally used a firearm, personally used and intentionally discharged a firearm, and personally used and intentionally discharged a firearm, proximately causing great bodily injury to the attempted murder victim. The jury also found, in connection with the attempted murder, as to both defendants, that a principal used a firearm, a principal used and intentionally discharged a firearm and a principal used and intentionally discharged a firearm proximately causing great bodily injury to the attempted murder victim. The jury returned true findings on both firearm allegations: the gun discharge enhancement pursuant to section 12022.53, subdivision (d), and the allegation that a principal personally and intentionally discharged a firearm, pursuant to section 12022.53, subdivisions (d) and (e).

Regarding the attempted murder charge, as to both defendants, the sentencing court imposed an indeterminate term of 15 years to life, plus a term of 25 years to life for the enhancement pursuant to section 12022.53, subdivisions (d) and (e)(1), consecutive to count 2. The court struck the allegation that the defendant personally and intentionally discharged the firearm pursuant to section 12022.53, subdivision (d) as to both defendants, leaving in place the allegations that a principal discharged the firearm as to each defendant, as alleged pursuant to 12022.53, subdivisions (d) and (e)(1).

      b.    *Legal Principles*

Section 12022.53, subdivision (d), provides a 25-year-to-life term for a defendant who personally and intentionally discharges a firearm proximately causing great bodily

injury during an attempted murder. Section 12022.53, subdivision (e)(i) applies to the enhancements provided in subdivision (b) (which is a 10-year enhancement when any other principal personally uses a firearm), subdivision (c) (which is a 20-year enhancement when any other principal personally and intentionally discharges a firearm), and subdivision (d), (which is a 25-year-to-life term for any principal when any other principal personally and intentionally discharges a firearm proximately causing great bodily injury) when that person committed the crime for the benefit of a street gang.

Johnson argues, and Windfield joins, that subdivision (j) of section 12022.53 provides that for the penalties provided in that section to apply, any fact required under subdivision (b), (c) or (d) must be alleged in the accusatory pleading. According to defendants, the third amended information did not include firearm enhancements respecting count 2, because the third amended information only named Smith in the substantive count and the firearm enhancement allegations. However, this argument ignores the discussion in which the prosecutor insured that count 2 named the correct victim. While the record on appeal does not include the interlineated version of the third amended complaint, all parties in the trial level proceedings acknowledged the interlineations, and the jury's verdicts show that the requisite corrections had been made. We decline the invitation to reverse jury findings based on the state of the clerk's transcript as to the nature of the allegations in the version of the information that was submitted to the jury where defendants did not seek to augment the record to include the version of the complaint provided to the jury.

36

The first amended information properly alleged the attempted murder of Peete, along with firearm enhancements related to that crime involving Peete. For unknown reasons, the document entitled the Third Amended Information replaced Peete's name with that of Smith. Johnson never objected or demurred to the third amended information on the ground it named the wrong victim, and he was previously aware of the firearm discharge allegations from the original information, and entered not guilty pleas to all counts and allegations.

The jury instructions relating to the crime of attempted murder referred to Peete, as were the firearm enhancements allegations pertaining to the attempted murder of Peete. Neither defendant objected to the instructions on the ground that no firearm enhancements were alleged as to him on count two. When the verdicts were read, neither defendant complained that the findings on the firearm enhancement as to count 2 were erroneous because they had not been charged with the enhancement allegations.

Defendants attempt to analogize the situation here to that in *People v. Mancebo* (2002) 27 Cal.4th 735 and its progeny fails. In *Mancebo,* the defendant was convicted of multiple sex offenses against two victims on separate occasions. He was charged with ten offenses and convicted and sentenced under the One Strike law, section 667.61 based on the gun use, along with a separate gun use enhancement pursuant to section 12022.5, subdivision (a), although only one gun use allegation had been alleged and found true. The court held that because the fact of the gun use had been used to impose the

37

indeterminate term under section 667.61, it was unavailable for imposition as a stand-alone enhancement. That is not the situation here.

The record reflects that all parties and the court understood that the last corrections suggested by the People had been made with the intention of modifying the allegations only to the extent that count 2 incorrectly named Smith, the murder victim, as the victim of the attempted murder count, and that enhancement language alleging that defendants personally and intentionally discharged the firearm causing death to Smith was intended to reflect the firearm discharge in causing great bodily injury to Peete. The presence of the correctly stated allegation in the first amended information, which was read to the jury before trial formally commenced, as well as in the instructions, negates any claim that defendants lacked notice of the charges. Instead, their acquiescence to the amendment, the instructions, and the verdict are tantamount to forfeiture of any claim respecting the enhancement allegation as to count 2.

Because the jury made a true finding of the enhancement allegation under section 12022.53, subdivisions (d) and (e)(1), and because the information alleged the necessary facts, i.e., that defendants personally and intentionally discharged a firearm causing great bodily injury and another principal personally and intentionally discharged a firearm causing great bodily injury where the crime was committed for the benefit of a gang[7], the

---

[7] The jury should not have made findings that defendants and a principal personally used a firearm or personally and intentionally discharged a firearm, but since no penalty was imposed as to those findings, there was no violation of subdivision (j). Because the trial court struck those allegations, no further action on our part is required.

enhancements were properly found, although, as we will explain *post,* the court may exercise discretion to strike or dismiss the enhancements.

5. *Sentencing*

a. *Windfield's Sentence as Cruel and Unusual*

Windfield was sentenced in this case to three 25-year-to-life terms, plus a life term with a 15-year minimum which was run concurrently with the time imposed in another case of two 25-year-to-life terms, two 15-year-to-life terms plus 40 years. Windfield contends that this sentence violates *Miller v. Alabama* (2012) 567 U.S. 460 [132 S.Ct. 2455] (*Miller*).

Windfield was 18 years old when he committed the crimes in both cases and 21 when he was sentenced for both. He points out that his minimum parole eligibility extends beyond any life expectancy he could possibly have. In *Miller*, the United States Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Miller*, *supra*, 567 U.S. 465 [132 S.Ct. at p. 2460]; see also *Graham v. Florida* (2010) 560 U.S. 48, 74 [130 S.Ct. 2011, 2030, 176 L.Ed.2d 825, 845], holding that a sentence of life without parole for a juvenile offender who did not commit homicide violated the Eighth Amendment].)

Windfield contends that scientific literature shows that the features of juveniles discussed in *Miller* extend to 18 year old's. However, we are bound by precedent and there is no precedent for us to declare that *Miller* applies to 18 year old's. Our legislature

has determined that 18 is the age at which a person is considered an adult. (*People v. Gamache* (2010) 48 Cal.4th 347, 405.)

In *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 (*Argeta*), the appellate court rejected an identical argument, holding, "while '[d]rawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [, it] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.] Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude [that the defendant's] sentence is not cruel and/or unusual under *Graham* [*v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011]], *Miller, supra,* 567 U.S. 460 [132 S.Ct. 2455], or [*People v.*] *Caballero* [(2012) 55 Cal.4th 262]."

Recently, in *Gutierrez*, *supra*, 58 Cal.4th at page 1380, the California Supreme Court endorsed the distinction drawn between those under the age of 18 at the time of the crime and those 18 or older. Based on these authorities, Windfield's sentence did not violate the Eighth Amendment.

Notwithstanding the stated judicial policy, section 3051, added in 2013 pursuant to Senate Bill No. 260, and amended in 2014 (effective in 2015) pursuant to Senate Bill No. 261, entitles a prisoner serving a term of 25 years to life to a Youth Offender Parole

hearing in the 25th year of his incarceration, if the offender was under the age of 23 at the time of his offense. (§ 3051, subd. (b)(3).) The California Supreme Court has directed us to consider the holding of *People v. Perez, supra,* 3 Cal.App.5th 612, and we have now done so.

In *Perez, supra,* 3 Cal. App.5th 612, the Fourth District, Division Three agreed with the holding of *Argeta, supra*, and held that the lengthy indeterminate term did not violate the prohibition against cruel and unusual punishment under *Miller* and *Gutierrez* because the defendant was not a juvenile. But it also noted that the recent passage of Senate Bill No. 260, enacting sections 3051, 3046, subdivision (c), and 4801, subdivision (c), provided for youth offender parole eligibility for persons who were 25 years old or younger at the time of committing the controlling offense. Windfield falls within that class.

The court in *Perez, supra,* 3 Cal.App.5th 612 acknowledged that the defendant did not have the opportunity to make a record of the type of information deemed relevant at a youthful offender parole hearing, pursuant to sections 3051 and 4801. For that reason, in light of the decision in *Franklin, supra,* 63 Cal.4th at page 284, the court concluded he was entitled to a limited remand at which hearing both parties could make an accurate record of the defendant's characteristics and circumstances at the time of the offense so that the Board of Parole Hearings, years later, could discharge its duties and give proper weight to the youth-related factors. (*People v. Perez, supra,* 3 Cal.App.5th at p. 619.)

Because Windfield was under the age of 23 at the time of his offense, he will be eligible for parole in the 25th year of his term pursuant to section 3051. Although he is not entitled to resentencing, he is entitled to a limited remand at which he and the People may make an accurate record of his characteristics and circumstances at the time of the offense for use by the Board of Prison Terms in determining his parole eligibility.

b. *Johnsons's Sentence as Cruel and Unusual*

Johnson, who was 17 when he committed these crimes, also received a sentence of 90 years to life. As he correctly points out, the California Supreme Court has held that a sentence of 110 years to life is the functional equivalent of a sentence of life without parole. (*People v. Caballero* (2012) 55 Cal.4th 262, 295 (*Caballero*); see also *People v. Mendez* (2010) 188 Cal.App.4th 47, 63 [a sentence of 84 years to life is the same]; *Argeta, supra,* 210 Cal.App.4th at p. 1482 [a term of at least 75 years in prison for a defendant who was 15 years old at the time of the crime "likely requires that he be in prison for the rest of his life"].) Johnson argues the sentencing court improperly imposed an indeterminate life sentence without individualized consideration of him as a person. In our original opinion, we agreed, and remand the matter for resentencing to give the trial court the opportunity to consider the *Miller* factors.

After we filed our original opinion, the Supreme Court granted review on its own motion and held it pending its decision in the then pending case of *Franklin.* After *Franklin* was decided, the Supreme Court retransferred the case to us for reconsideration in light of *Franklin.* We have done so.

In *Miller, supra,* the United States Supreme Court held that it is a violation of the Eighth Amendment to impose a mandatory life without parole sentence upon a juvenile in a homicide case because such a penalty "precludes consideration of [the juvenile's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." (*Miller, supra,* 567 U.S. at p. 477.) Subsequently, the United States Supreme Court held in *Graham v. Florida, supra,* that the *Miller* prohibition applied to all sentences that were the functional equivalent of life without possibility of parole.

In *Franklin,* our Supreme Court held that the constitutional claim of cruel and unusual punishment, established by the United States Supreme Court in *Miller* and *Graham* had been mooted by the passage of Senate Bill No. 260 (2013–2014 Reg. Sess.) (Senate Bill No. 260), embodied in sections 3051 and 4801. Those sections were enacted to bring juvenile sentencing in conformity with *Miller, Graham*, and *Caballero, supra.* (*Franklin, supra*, 63 Cal.4th at p. 268.) Section 3051 provides for a youth offender parole hearing after a juvenile has served 25 years to life on a first degree murder conviction. Although the constitutional claim was mooted, the Supreme Court concluded Franklin had raised "colorable concerns as to whether he was given adequate opportunity at sentencing to make a record of mitigating evidence tied to his youth." (*Franklin, supra,* 63 Cal.4th at pp. 268-269.)

In our original opinion, we commented that there was no sentencing memorandum submitted by counsel for Johnson, the probation report contained scant information about

Johnson personally, and neither counsel for Johnson nor the sentencing court addressed this topic of youth factors during sentencing. Having been charged in adult court as a juvenile, Johnson is entitled to an opportunity to make a record of mitigating evidence tied to his youth.

In *Franklin,* the Supreme Court held that the defendant was not entitled to be resentenced, but, because it was unclear whether the defendant had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing, the Supreme Court remanded the matter to the lower court to make a record of information relevant to his eventual youth offender parole hearing. (*Franklin*, *supra,* 63 Cal. 4th at p. 284.)

The same result is appropriate here. While defendant is not entitled to be resentenced, he is entitled to an opportunity to make a record of matters that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. (*Franklin, supra,* 63 Cal. 4th at p. 284.)

In our original opinion, we agreed that Johnson was entitled to resentencing under *Gutierrez*. We now hold, pursuant to the Supreme Court's direction, that while defendant is not entitled to resentencing, he is entitled to an opportunity to make a record of the *Miller* considerations in the trial court, to be considered at his eventual youth offender parole hearing.

c. *Applicability of Senate Bill No. 620, Amending Section 12022.53,*

*subdivision (h)*

Appellants were each sentenced to 25 to life for first degree murder (count 1), plus a consecutive term of 25 to life for the section 12022.53, subdivisions (d) and (e) firearm enhancement on that count; as well as a consecutive term of 15 years to life for premeditated attempted murder (count 2), plus another consecutive, 25-to-life term for the section 12022.53, subdivisions (d) and (e) firearm enhancement in connection with that count. The trial court also imposed a sentence of 9 years imprisonment for assault with a semiautomatic firearm, as well as a 10-year term for the section 12022.5, subdivision (a) firearm enhancement alleged in connection with that offense, but stayed those sentences pursuant to section 654.

At the time of appellants' sentencing, imposition of the firearm enhancements was mandatory, and trial courts expressly lacked authority to strike firearm enhancements proven under sections 12022.5 and 12022.53. (See §§ 12022.5, subd. (c), 12022.53, subd. (h).) That changed with the enactment of Senate Bill No. 620, which became effective January 1, 2018, and removed the prohibition on striking the enhancements. Following the enactment, the Legislature added the following language to both sections 12022.5 and 12022.53: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§§ 12022.5, subd. (c), 12022.53, subd. (h).)

45

Because the judgment of conviction in appellants' case was not yet final when Senate Bill No. 620 took effect, the new statutory amendment applies retroactively to appellant. (*People v. Chavez* (2018) 22 Cal.App.5th 663, 712; *People v. Arredondo* (2018) 21 Cal.App.5th 493, 506-507; see also, *In re Estrada* (1965) 63 Cal.2d 740.) Courts have held that "remand is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; see also *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.)

""""Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court." [Citations.]'" (*People v. Flores* (2020) 9 Cal.5th 371, 431 (*Flores*).) Where the court was unaware of its discretionary powers, it can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record. (*Id.,* at pp. 431-432.) In such circumstances, the appropriate remedy is to remand for resentencing unless the record "'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

In *Flores,* the California Supreme Court concluded that the record clearly indicated the trial court would have reached the same conclusion even if it had been aware of its discretion. (*Flores, supra,* 9 Cal.5th at p. 432.) But we cannot be so sure here.

46

In the present case, on remand, the court will hear and consider information about the defendants' youth pertinent to the youth offender statutes, which may or may not affect its discretion whether to impose one or all of the enhancements found true by the jury. Considering that multiple gun enhancements were found respecting each of the counts, it is not for us to say that a different result is not likely.

On remand, the court shall exercise its discretion whether to strike or dismiss any of the enhancements pursuant to sections 12022.5, subdivision (c), and 12022.53, subdivision (h).

### d. *Correction of the Abstracts of Judgment*

Defendants correctly point out that their abstracts incorrectly state that the dates of the offenses were 2011, when they were 2009. We will direct the trial court to correct the abstracts accordingly.

### e. *Pronouncement of Sentence on Johnson*

Johnson argues he was not actually sentenced because the trial court, after indicating that his sentence would be the same as that to be imposed on Windfield, asked Johnson's counsel if he would waive the court's repeating the sentence that was actually imposed on Windfield. Johnson's counsel agreed, and the matter was left there. Defendant claims the trial court did not actually sentence him. We disagree.

As the People point out, "claims deemed waived on appeal involve sentences which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Here, defendant was

47

present when the sentence as to Windfield was pronounced, was advised that the same sentence was to be imposed on him, and when the court asked his counsel if he would waive the need to repeat the sentence as to himself, his counsel agreed. He has waived any error in the pronouncement of judgment.

Next, Johnson claims the sentencing court acted in excess of its authority by making a post-disposition correction to certain allegations as well as the sentence as to count 3. According to Johnson, as to counts 1 and 2, the court improperly struck the allegation pursuant to section 12022.53, subdivision (d), which had been found true by the jury in addition to the allegation pursuant to section 12022.53, subdivisions (d) and (e)(1), in post-sentencing correction. In light of our remand to give the trial court an opportunity to exercise its discretion to strike or dismiss the gun discharge enhancement pursuant to the amended provisions of section 12022.53, subdivision (h) (Sen. Bill No. 620, *ante*), this issue is moot.

f. *Applicability of Proposition 57, Requiring a Juvenile Transfer Hearing, to Johnson's Sentence.*

In the supplemental brief filed following the Supreme Court's second retransfer following publication of the *Canizales* opinion, Johnson posited a second issue not previously raised in the appeal. Specifically, he argues that insofar as this court's judgment is not final, he is entitled to retroactive application of Proposition 57, requiring a juvenile court transfer hearing for certain defendants who were juveniles at the time of the commission of their crimes. The People agree.

The California Supreme Court has determined that the provisions of Proposition 57 amending Welfare and Institutions Code section 707, subdivision (a)(1), should be applied retroactively to cases not final on appeal. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 309, citing *People v. Vela* (2017) 11 Cal.App.5th 68, 81.) In *Lara,* the Supreme Court adopted the remedy described in *Vela*, conditionally reversing the convictions and sentence of the defendant and directing the juvenile court to conduct a juvenile transfer hearing pursuant to Welfare and Institutions Code, section 707. (*Lara, supra,* 4 Cal.5th at p. 313.)

We have already concluded that defendant Johnson is entitled to a limited remand for resentencing. However, before resentencing can take place, we direct a limited remand to the juvenile court to conduct a fitness hearing, as described in *People v. Vela, supra,* 11 Cal.App.5th at page 82. In conducting the transfer hearing, the juvenile court shall treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Johnson's cause to a court of criminal jurisdiction. (Welf. & Inst. Code, § 707, subd. (a)(1); *Vela, supra,* at p. 82.) If, after conducting the juvenile transfer hearing, the court determines that Johnson is "not a fit and proper subject to be dealt with under the juvenile court law," then Johnson's convictions and sentence are to be reinstated. (Welf. & Inst. Code, § 707.1, subd. (a).) On the other hand, if the juvenile court finds that it would not have transferred Johnson to adult court, it shall treat his convictions as juvenile adjudications and impose an appropriate "disposition" within its discretion. (*Ibid.*)

49

g. *Custody Credits for Johnson*

The parties agree that the sentencing court shorted Johnson by one day in its calculation of his presentence custody credits, although the People argue the issue was waived. The clerk will be directed to correct the credits calculation when it prepares the amended abstract of judgment.

## DISPOSITION

The convictions for both defendants are affirmed.

We affirm the judgment as to Windfield but remand the matter of sentencing: (1) for a hearing in the trial court at which both defendant and the People can make an accurate record of the defendant's characteristics and circumstances at the time of the offense; (2) to amend Windfield's abstract of judgment to show that the crimes were committed in 2009, not 2011, as his abstract currently states; and (3) to allow the trial court to exercise its discretion pursuant to section 12022.53, subdivision (h), whether to strike or dismiss any of the firearm enhancements as contemplated by Senate Bill No. 620.

As to Johnson, we first direct a limited remand to the juvenile court to conduct a fitness hearing. In conducting the transfer hearing, the juvenile court shall treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Johnson's cause to a court of criminal jurisdiction. If, after conducting the juvenile transfer hearing, the court determines that Johnson is "not a fit and proper subject to be dealt with under the juvenile court law," then Johnson's

50

convictions are to be reinstated. On the other hand, if the juvenile court finds that it would not have transferred Johnson to be tried as an adult, it shall treat his convictions as juvenile adjudications and impose an appropriate "disposition" within its discretion. (*Ibid.*)

In the event Johnson is unfit for treatment in juvenile court, we also order a limited remand of Johnson's sentence to provide an opportunity to present evidence of mitigation due to his youth, pursuant to the holding of *Franklin, supra*. In addition, the court shall exercise its discretion whether to strike or dismiss any of the firearm enhancements within the meaning of Senate Bill No. 620. Upon further proceedings relating to Johnson, the trial court is directed to amend the abstract of judgment to correctly note the date of commission of the crimes and to award an additional day of presentence custody credits, the latter of which should also be reflected in the minutes of the court.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.

We concur:

MILLER
J.

CODRINGTON
J.

51